**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

MUDDY WATERS CAPITAL LLC,

      Plaintiff,

  v.

JOHN DOES 1-10,

      Defendants.

_____

Case No.:

Related Action: 3:19 Civ. 1293-SK (N.D. Cal.)


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION TO COMPEL DISCOVERY FROM THIRD PARTIES**
**BANK OF AMERICA CORPORATION AND**
**MERRILL LYNCH PROFESSIONAL CLEARING CORPORATION**


**FLETCHER LAW, PLLC**
154 Grand Street
New York, New York 10013
Tel: (212) 320-8945
Fax: (347) 983-0046
Email: jordan@fletcherlaw.co
*Counsel for Plaintiff Muddy Waters*
*Capital LLC*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION………………………………………………………...………………..1

FACTS………………………………………………………………………..……………….2

A.    **Factual Background**………………………………………………………...………2

B.    **Procedural Background**………………………………………………………………3

    1.    MWC's Efforts to Identify the John Doe Defendants…………………..……….3

    2.    Judge Kim's Deadline for MWC to Identify the John Doe Defendants………….…6

C.    **The Relationships Among MWC and the BAML Entities**……………………….…..6

    1.    The Brokerage Relationship Between MWC and the BAML Entities…………..…6

    2.    The Relationship Between MLPro and MLI…………………………………….…8

    3.    The Relationship Between BAC and MLI…………………………………………9

LEGAL STANDARD………………………………………………………………...……..10

ARGUMENT…………………………………………………………………………………11

A.    **BAC and MLPro Have Possession, Custody, or Control Over MLI's Records** …….11

    1.    BAC Has Possession Custody, or Control over MLI's Records…………………11

    2.    MLPro Has Possession Custody, or Control over MLI's Records……………….13

B.    **All Relevant Factors Weigh in Favor of Compelling Production**……………………15

    1.    Foreign Discovery Is Not Required, and Its Success Is Uncertain……..…………15

    2.    No Conflict of Laws Exists; Even if One Did, the Comity Analysis Favors Production………………………………………………..……………………………17

CONCLUSION……………………………………………………………………………22

## **TABLE OF AUTHORITIES**

**Cases**

*Alimenta (U.S.A.), Inc. v. Anheuser-Busch Companies,* 99 F.R.D. 309 (N.D. Ga. 1983)............ 14

*Babaev v. Grossman*, 03 Civ. 5076, 2008 WL 4185703 (E.D.N.Y. Sept. 8, 2008)..................... 10

*Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997) ..... 10

*British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 90 Civ. 2370, 2000 WL 713057

    (S.D.N.Y. June 2, 2000)................................................................................................... 17, 20

*Compagnie Francaise D'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105

    F.R.D. 16 (S.D.N.Y. 1984) ................................................................................................... 14

*Cooper Indus., Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918 (S.D.N.Y. 1984)................ 11, 14

*DeSmeth v. Samsung America, Inc.*, 92 Civ. 3710, 1998 WL 74297 (S.D.N.Y. Feb. 20, 1998).. 12

*Dietrich v. Bauer*, 95 Civ. 7051, 2000 WL 1171132 (S.D.N.Y. Aug. 16, 2000) ........................ 11

*First National City Bank v. Internal Revenue Service*, 271 F.2d 616 (2d Cir. 1959) ................. 13

*Gerling Intern. Ins. Co. v. C.I.R*, 839 F.2d 131 (3d Cir. 1988)............................................. 13, 14

*Ghana Supply Commission v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979) .......... 14

*Gucci America, Inc. v. Curveal Fashion*, 09 Civ. 8459, 2010 WL 808639 (S.D.N.Y. Mar. 8,

    2010) .................................................................................................................18, 19, 20

*Huang v. iTV Media, Inc.*, 13 Civ. 3439, 2017 WL 706194 (E.D.N.Y. Feb 22, 2017)............... 14

*In re ATM Fee Antitrust Litigation*, 233 F.R.D. 542 (N.D. Cal. 2005)....................................... 11

*In re Maxwell Commc'n Corp.*, 93 F.3d 1036 (2d Cir. 1996)..................................................... 18

*In re Mercedes-Benz Emissions Litig.*, 2:16 Civ. 881 (D.N.J. Nov. 4, 2019)........................ 17, 20

*In re Ski Train Fire of November 11, 2000 Kaprun Austria*, MDL 1428, 2006 WL 1328259

    (S.D.N.Y. 2006)............................................................................................................. 10, 11

*JPMorgan Chase Bank v. Winnick*, 228 F.R.D. 505 (S.D.N.Y. 2005)........................................ 14

*Linde v. Arab Bank, PLC*, 262 F.R.D. 136 (E.D.N.Y. 2009)....................................................... 10

*M.L.C., Inc. v. N. Am. Philips Corp.*, 109 F.R.D. 134 (S.D.N.Y. 1986) ..................................... 10

*Matter of Marc Rich & Co., A.G.*, 707 F.2d 663 (2d Cir. 1983)................................................. 10

*Merck Co. v. Sandoz, Inc.*, 10 Civ. 1625, ECF No. 62 (D.N.J. Nov. 23, 2010) ......................... 14

*Panaviotou v. Sony Music Ltd.*, Ch. 1992 P. No. 8711 (1993) ................................................... 16

*Sanofi-Aventis v. Sandoz, Inc.*, 272 F.R.D. 391 (D.N.J. 2011) .................................................. 14

*Searock v. Stripling*, 736 F.2d 650 (11th Cir. 1984) .................................................................. 10

*Soletanche and Rodio, Inc. v. Brown Lambrecht Earth Movers, Inc.*, 99 F.R.D. 269 (N.D. Ill. 1983) ................................................................................................................................ 14

*Ssangyong Corp. v. Vida Shoes Int'l, Inc.*, 03 Civ. 5014, 2004 WL 1125659 (S.D.N.Y. May 20, 2004) ...................................................................................................................................... 20

*State of Minnesota v. Philip Morris Inc.*, 1998 I.L.Pr. 170 (Eng. Ct. App. 1997) ...................... 16

*Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143 (S.D.N.Y. 2011) ...................................... 10, 18

## **Statutes**

12 U.S.C.A. § 1841(a)(1).......................................................................................................... 12

GDPR Art. 4(1) ......................................................................................................................... 17

GDPR Art. 49(1)(e) ................................................................................................................... 17

## **Rules**

Fed. R. Civ. P. 45 ..................................................................................................................... 10

## INTRODUCTION

This motion to compel third party discovery relates to a private lawsuit for insider trading filed on March 11, 2019 and currently pending before the Honorable Sallie Kim in the United States District Court for the North District of California.

Plaintiff Muddy Waters Capital LLC ("MWC") suffered injury as a result of four illegal securities transactions ("December 15 Transactions") committed by certain unknown trade counterparties, *i.e.*. John Does 1-10 ("John Doe Defendants"), using material non-public information. Since MWC does not currently know the identity of the John Doe Defendants who served as the buyer counterparties in the December 15 Transactions, MWC has been unable to effect service on those defendants. However, the trades – in which MWC participated as seller's agent – were brokered by at least two Bank of America Merrill Lynch ("BAML") entities. Accordingly, entities within the BAML corporate ecosystem *are* in possession of records and information which identify the name, address, and contact information of the counterparty purchasers in the December 15 Transactions, *i.e.*, the John Doe Defendants.

In its effort to identify the John Doe Defendants, MWC has served several court-authorized subpoenas. Two subpoenas were served upon Merrill Lynch Professional Clearing Corporation ("MLPro") – MWC's direct BAML counterparty to the prime brokerage agreement pursuant to which the December 15 Transactions were arranged, executed, and settled on MWC's behalf. A third subpoena was served upon Bank of America Corporation ("BAC") – the top-level corporate parent of all BAML entities. Yet after repeated obstructions and delays by MLPro and BAC, including (i) refusals to produce documents that are admittedly in their possession, (ii) the proffering of a woefully unprepared MLPro corporate deposition witness, and (iii) BAC's blanket refusal to proffer any corporate witness at all, BAC and MLPro have now staked out a unified

1

position: that the records in question are in the sole possession and custody of BAC's London-based subsidiary, Merrill Lynch International ("MLI"), and neither BAC nor MLPro have any obligation to produce those records, despite service of MWC's court-authorized subpoenas.

MWC asks this Court to order BAC and MLPro to produce all records responsive to MWC's subpoenas, including those that are in the direct custody of MLI. An order compelling production is appropriate because, as discussed below:

First, as a factual and legal matter, both BAC and MLPro have possession, custody, or control over the documents in MLI's custody;

Second, MWC is not required to obtain the records directly from MLI via foreign discovery in the United Kingdom, and, indeed, it is unclear whether such efforts can even succeed under UK law; and

Third, there is no foreign law which restricts the cross-border transfer of the records at issue here, and even if a conflict of laws did exist, the comity analysis strongly favors the United States' interest in compelling production of the documents.

Given that Judge Kim has cautioned MWC that she may be forced to dismiss its lawsuit if MWC is unable to identify the John Doe Defendants through discovery before the next case management conference, currently scheduled for February 24, 2020, MWC respectfully asks this Court to issue an order requiring BAC and MLPro to produce MLI's responsive documents on or before February 17, 2020.

## FACTS

### A.    Factual Background

MWC is a San Francisco-based private investment firm that conducts and publishes investigative research on publicly-held companies while also taking investment positions based on

its research. In early December 2015, MWC began seeking to establish "short" positions on several series of corporate bonds issued by French retail conglomerate Casino Guichard-Perrachon, S.A. ("Casino"). MWC set up its short positions on the Casino bonds using the professional services of MLPro, acting as an agent for certain affiliated BAML entities ("BAML Entities"). With the assistance of MLPro and the BAML Entities, including BAC's UK-based subsidiary MLI as executing broker, MWC entered into four short-sale transactions on December 15, 2015 (*i.e.*, the December 15 Transactions) with an unknown counterparty purchaser or purchasers (*i.e.*, the John Doe Defendants), for a total price of just under $18 million.

Just a few hours after MWC executed the December 15 Transactions, however, the market closed for the day, and Casino issued a surprise press release trumpeting that it was about to undertake a substantial "financial deleveraging" plan. Because Casino was a heavily leveraged company, the plan was perceived by the market as a significant positive development for Casino's bonds. The surprise announcement caused the price of the Casino bonds to rise substantially – approximately four percentage points, which could have netted a single counterparty purchaser to the December 15 Transactions roughly $650,000 to $875,000 in value overnight. These price increases harmed MWC and its principal, MLAF LP, by diminishing the profits they otherwise might have made when MWC subsequently closed out the short positions on the Casino bonds. This lawsuit is brought to recover for MWC the economic harm that it suffered – and to recoup the ill-gotten windfall that the John Doe Defendants reaped – as a result of their unlawful use of inside information concerning Casino's deleveraging announcement.

### B.   Procedural Background

### 1.   MWC's Efforts to Identify the John Doe Defendants

In early October 2018, prior to the filing of this action, counsel for MWC contacted MLPro

to request information concerning the identities of the trade counterparties to the December 15 Transactions. (Declaration of Jordan Fletcher ISO Motion to Compel ("Fletcher Decl." ¶ 4.) Having received no response, MWC filed suit in the Northern District of California in order to seek judicial assistance with the necessary discovery. (*Id.*) Shortly after filing the suit, counsel for MWC again reached out to the MLPro to ask that it voluntarily provide the requested information, but MLPro refused to do so. (*Id.* ¶ 5.)

On April 30, 2019, MWC filed an *ex parte* motion for limited expedited discovery requesting permission from the presiding Magistrate Judge Sallie Kim to serve subpoenas pursuant to Federal Rule of Civil Procedure ("FRCP") 45 on MLPro and the BAML Entities seeking documents and testimony tailored to uncover the identity of all outside counterparties to the December 15 Transactions. (*Id.* ¶ 6.) The Court granted that motion on June 4, 2019. (*Id.* and Ex. B, thereto.)  Shortly thereafter, MWC served a document and deposition subpoena upon MLPro ("First MLPro Subpoena"). (*Id.* ¶ 7 and Ex. C, thereto.)  MLPro objected entirely and categorically to the subpoena, and during the course of subsequent communications over the next six weeks, MLPro's in-house counsel represented that MLPro did not have any documents or information related to the December 15 Transactions. (*Id.* and Ex. D, thereto.)

On October 2, 2019, MWC served subpoenas upon three other BAML Entities, including BAC, seeking documents and testimony related to the December 15 Transactions, as well as documents and testimony concerning BAC's possession, custody, or control over such information ("BAC Subpoena"). (*Id.* ¶ 8 and Ex. F, thereto.) On October 18, 2019, after repeated, ignored requests that MLPro proffer a FRCP 30(b)(6) witness, MWC served a second deposition subpoena pursuant to FRCP 45 and 30(b)(6) upon MLPro ("Second MLPro Subpoena"). (*Id.* ¶ 9 and Ex. E, thereto.) On November 13, 2019, MWC took the deposition of MLPro's corporate representative.

(*Id.* ¶ 10.) The designee testified, *inter alia*, that MLPro does not know, and does not have access to, records or information concerning, the identity of any outside counterparty to the December 15 Transactions. (*Id.* ¶ 11 and Ex. H, thereto ("MLPro Tr.") 44:25-46:5.)  The designee further stated that because MLI executed the trades, MLI is or should be in possession of transaction records reflecting the identity of any outside counterparty to the December 15 Transactions. (*Id.* and MLPro Tr. 54:22-56:25 and 59:15-59-21.) On November 15, 2019, BAC responded to the BAC Subpoena objecting categorically to production, and suggested that documents concerning the identity of any such outside counterparty are in MLI's possession. (*Id.* ¶ 12 and Ex. I, thereto.)  In its objection letter, BAC described itself as merely a "holding company" and represented it does not have possession of records in MLI's direct custody. (*Id.* Ex. I.)

On November 19, 2019, counsel for MWC requested (i) that BAC confirm by November 21, 2019 whether it would proffer a FRCP 30(b)(6) witness pursuant to the BAC Subpoena, and (ii) that MLPro produce certain documents related to the December 15 Transactions that MLPro's corporate designee testified are in MLPro's possession. (*Id.* ¶ 13 and Ex. J, thereto.)  As of the date of this motion, BAC has neither complied with, nor even responded to, either of these requests. (*Id.* ¶ 15.) On November 21, 2019, outside counsel for BAC and MLPro stated that BAC and MLPro would consent to the jurisdiction of the United States District Court for the Southern District of New York for the resolution of a motion to compel discovery in a single joint proceeding.[1] (*Id.* ¶ 21.)[2]

---

[1] Even had such consent not been freely given, MLPro is headquartered in this District, and BAC operates and is subject to jurisdiction here based upon both its own activities and the activities of its myriad subsidiaries that are headquartered and/or operate here. This District was listed as the place of compliance on all of the relevant subpoenas.

[2] Outside counsel for BAC and MLPro further proposed that, rather than having BAC or MLPro produce the requested records, the BAML Entities might provide MWC with a letter stating that MLI would produce the requested documents in response to a lawful order from the appropriate

On November 22, 2019, MWC sent a letter to MLI in London asking it to voluntarily provide documents and information concerning the identity of the outside counterparty purchaser(s) involved in the December 15 Transactions. (*Id.* ¶ 16.) On November 25, 2019, MLI responded by letter refusing to voluntarily produce such information, but confirming that it does in fact possess the requested information. (*Id.* and Ex. K, thereto.) During a phone call with MWC's counsel on November 26, 2019, MLI re-confirmed that it has records in its possession which identify the name, address, and contact information of the counterparty buyers in the December 15 Transactions, and suggested that such records comprise no more than a small handful of documents.[3] (*Id.* ¶ 17.)

### 2.    Judge Kim's Deadline for MWC to Identify the John Doe Defendants

Notwithstanding MWC's extensive efforts to obtain the identity of the John Doe Defendants from MLPro and BAC – and the extensive lengths to which MLPro and BAC have gone to obstruct those efforts – during a case management conference held on November 18, 2019, Judge Kim cautioned that if MWC is unable to identify the John Doe Defendants through discovery before the next case management conference, currently scheduled for February 24, 2020, Judge Kim may be required to dismiss MWC's lawsuit.  (*Id.* ¶ 20.)

### C.    The Relationships Among MWC and the BAML Entities

### 1.    The Brokerage Relationship Between MWC and the BAML Entities

The December 15 Transactions were arranged, executed, cleared, and settled pursuant to a

---

UK authority. (Fletcher Decl. at 5 n.1.) On November 25, 2019, MLI, itself, did in fact provide such a letter. (*Id.* ¶ 16 and Ex. K, thereto.)

[3] On November 27, 2019, MWC filed an *ex parte* motion with Judge Kim seeking issuance of a Letter of Request that can be used to obtain discovery from MLI in the United Kingdom via the Hague Convention procedures. As of the date of this filing, Judge Kim has not yet ruled on MWC's motion. (*Id.* ¶¶ 18-19.)

prime brokerage agreement dated November 4, 2015 ("Prime Brokerage Agreement") between MWC and its principal, MLAF LP, on the one hand, and MLPro, on behalf of itself and as agent for the BAML Entities, on the other. (Declaration of Scott Devinsky ISO Motion to Compel ("Devinsky Decl.") ¶¶ 1-2 and Ex. A, thereto.)  Although MWC at times communicated with MLI, which helped arrange and execute the December 15 Transactions, MWC did not have a direct contract with MLI related to the December 15 Transactions. (*Id.* ¶ 4.) Rather, in executing the December 15 Transactions, MWC's communications and relationship with MLI occurred solely under the auspices of the Prime Brokerage Agreement. (*Id.*) Pursuant to the Prime Brokerage Agreement, MLI, as one of the BAML Entities, was an intended beneficiary of MWC's "agreements, representations, and covenants," and of MLPro's "rights," thereunder. (*Id.* Ex. A at 1 (highlighting added).)

As short sale transactions, arranging the December 15 Transactions required, first, that MWC borrow certain Casino bonds which it would thereafter sell to willing buyers located by MLI. (MLPro Tr. 86:11-86:20.) The BAML Entities secured confirmation for MWC that they could obtain such Casino bonds for MWC to borrow, and email records in MWC's possession indicate that MLPro, itself (*i.e.*, not just as an agent for other BAML Entities), may have assisted, along with MLI, in locating the Casino bonds that MWC sold short in the December 15 Transactions. (Devinsky Decl. ¶ 5.)[4] In any event, prior to their sale to the John Doe Defendants, the Casino bonds sold in the December 15 Transactions were placed in MWC's New York-based MLPro brokerage account. (MLPro Tr. 50:5-50:24 and 96:25-97:5.) MLPro subsequently

---

[4] Despite this topic's inclusion on MWC's FRCP 30(b)(6) notice to MLPro, MLPro's representative was unprepared to testify as to whether MLPro participated in locating the borrowed Casino bonds, and he did not know whether or not MLPro was involved. (MLPro Tr. 87:16-89:8, 95:20-96:17, and 111:21-112:19.)

transferred those Casino bonds from MWC's brokerage account to MLI, which in turn executed the trades by transferring the Casino bonds to the John Doe Defendants in exchange for cash. (MLPro Tr. 49:20-49:24 and 96:25-97:5.) The cash was then transferred to MWC's New York-based MLPro brokerage account as part of MLPro's clearance and settlement of the December 15 Transactions. (MLPro Tr. 38:20-39:16 and 96:25-97:5.)

MWC's account statements reflecting the December 15 Transactions and other trades executed by MLI and cleared by MLPro into MWC's MLPro brokerage account were accessed via a Bank of America Merrill Lynch-branded "Global Prime Brokerage" client web portal. (Devinsky Decl. ¶ 6.)

### 2.     The Relationship Between MLPro and MLI

MLPro is a New York-based BAML Entity that, among other things, serves as prime broker (*i.e.*, central or "clearing" broker) for certain BAML clients who wish to engage in securities trades via brokerage entities across the BAML corporate ecosystem. (MLPro Tr. 18:22-19:2, 64:7-65:18, and 70:6-70:21.) In connection with the December 15 Transactions, MLPro served as an agent for MLI pursuant to the Prime Brokerage Agreement, and MLI was an intended beneficiary or rights and obligations thereunder (Devinsky Decl. Ex. A at 1 (highlighting added).) MLPro also maintained the brokerage account (i) from which the Casino bonds sold in the December 15 Transactions originated and (ii) into which the cash received in exchange for those Casino bonds was deposited. (MLPro Tr. 99:5-99:17.) Further, MLPro appears to have been involved, at least in part, in the location of borrowed securities for MWC to sell in the December 15 Transactions. (Devinsky Decl. ¶ 2.)

Although MLPro has maintained – and its corporate designee testified at deposition – that MLPro does not have access to information in MLI's possession which identify the name, address,

8

or contact information of the counterparty purchasers in the December 15 Transactions, MLPro's designee stated that this position is based solely on the fact that he would not be able to retrieve such information via his own MLPro computer system. (MLPro Tr. 116:14-117:18 and 119:19-120:6.) MLPro's designee also testified that: (i) he did not actually ask anyone – at MLI or elsewhere at BAML – to provide him with trade records or information in MLI's possession, and, thus, he did not ever receive a response to the effect that MLPro could not obtain such information. (MLPro Tr. 57:1-57:6, 58:25-59:10, 106:24-107:4, 109:12-110:5, and 114:18-116:13); (ii) representatives of MLPro and MLI do, from time to time as a matter of practice, share information concerning transactions in which both entities are involved. (MLPro Tr. 102:12-105:04); (iii) he does have the ability to – and in preparation for his deposition, he did, in fact – pose questions concerning information related to the December 15 Transactions but unavailable on MLPro's computer system to a Bank of America email address outside of MLPro and receive substantive answers in response. (MLPro Tr. 26:14-28:18, 73:21-74:6, 76:11-77:2, 78:15-78:24, and 108:2-109:1); and (iv) MLPro is not aware of any BAML policy, procedure, or rule – or any external law – which would prevent MLPro from obtaining records or information from MLI concerning the identity of any outside counterparty to the December 15 Transactions. (MLPro Tr. 105:21-106:23.)

### 3. The Relationship Between BAC and MLI

BAC is the top-level corporate parent that owns all other subsidiary entities in the BAML corporate ecosystem. (Fletcher Decl. Ex. L) According to BAML's publicly-available disclosures, MLI is BAC's "largest operating subsidy outside of the United States," and is a "[w]holly-owned indirect subsidiary of BAC." (*Id.* Ex. N.) BAC is MLI's "ultimate parent" and "controlling party" (*Id.* Ex. O at 10/10), and BAC and MLI share at least two board directors in common. (*Compare Id.* Ex. M with Ex. N and Ex. O at 6/10) (noting Susan S. Bies and Pierre P.J. de Weck).) MLI's

financial statements are consolidated into those of either BAC or an entity over which BAC has complete ownership (*Id.* Ex. O at 10/10), and BAC establishes and oversees various corporate policies that MLI must then follow and implement, including risk governance framework, strategic risk planning, and compensation plans. (*Id.* at 7/10-9/10.)

## LEGAL STANDARD

Rule 45 of the Federal Rules of Civil Procedure states that a subpoena may command a non-party to produce documents that are in its "possession, custody, or control." Fed. R. Civ. P. 45; *see also Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 141 (E.D.N.Y. 2009). "Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand." *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). "Control" may also be found where an entity has "access to" and the "ability to obtain the documents." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 144 (S.D.N.Y. 1997); *see also, e.g.*, *In re Ski Train Fire of November 11, 2000 Kaprun Austria*, MDL 1428, 2006 WL 1328259, *5 (S.D.N.Y. 2006) (same).

Regardless of the witness' legal relationship to a document, for the purposes of a FRCP 45 subpoena, a document is within a witness' "possession, custody, or control" if the witness has the practical ability to obtain the document. *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 147 (S.D.N.Y. 2011) (citing *Babaev v. Grossman*, 03 Civ. 5076, 2008 WL 4185703 at *3 (E.D.N.Y. Sept. 8, 2008) ("Documents are under a party's control when it has the right, authority or practical ability to obtain them from a non-party.")). "If the party subpoenaed has the practical ability to obtain the documents, the actual physical location of the documents – even if overseas – is immaterial." *Id.* (citing *Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir. 1983). *See also M.L.C., Inc. v. N. Am. Philips Corp.*, 109 F.R.D. 134, 136 (S.D.N.Y. 1986) ("A party may be

ordered to produce documents where that party has the legal right to obtain the documents, even though that party retains no copy, and regardless of whether the documents are beyond the jurisdiction of the court.")); *Cooper Indus.*, *Inc. v. British Aerospace*, *Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y. 1984) ("The fact that the documents are situated in a foreign country does not bar their discovery.").

## **ARGUMENT**

### A.    **BAC and MLPro Have Possession, Custody, or Control Over MLI's Records**

####    1.    **BAC Has Possession, Custody, or Control Over MLI's Records**

As the 100% owner of MLI, BAC has absolute legal and practical domination over its UK subsidiary. "Numerous courts have concluded that a parent corporation has a sufficient degree of ownership and control over a wholly-owned subsidiary that it must be deemed to have control over documents located with that subsidiary."[5] *Dietrich v. Bauer*, 95 Civ. 7051, 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000); *see also In re Ski Train*, 2006 WL 1328259, at *5 and *8 (collecting cases) ("[i]n light of the 100% ownership of Siemens Austria by Siemens AG, the Court concludes that the only reasonable conclusion to draw is that if Siemens AG needed the assistance or cooperation of Siemens Austria in a matter of concern to the company, it would receive such assistance, be it in the form of providing documents in Siemens Austria's custody, or otherwise.").

Indeed, at least one other federal court has previously ordered BAC to respond to discovery requests with respect to its wholly-owned subsidiaries, rejecting BAC's claim that it has "no control over those documents" and that to obtain them a plaintiff must subpoena them directly from the subsidiary. *In re ATM Fee Antitrust Litigation*, 233 F.R.D. 542, 544-45 (N.D. Cal. 2005).

---

[5] "This principle applies where the subsidiary is not owned directly but, rather, is owned by an intermediate corporation that is itself a wholly-owned corporation of the parent corporation." *Dietrich*, 2000 WL 1171132 at *3.

That court required BAC to produce the requested documents despite BAC's self-serving characterization of itself as a "holding company" and its subsidiary as a "separate legal entity." *See id.* ("To the contrary, by federal statute, a bank holding company necessarily controls its subsidiary banks" (citing 12 U.S.C.A. § 1841(a)(1))). Finding that "federal law requires that a parent respond to [discovery requests] with information from a subsidiary if it has access to that information and if the information is relevant and not privileged," the court concluded that BAC had "access to" the requested materials. *Id.* at 545 ("if BANA or any other wholly-owned subsidiary bank of BAC has possession and custody of documents responsive to Plaintiffs' requests, then BAC has legal control of the documents through its control of the subsidiary bank and must produce any which are responsive" to plaintiff's requests.)

Here, each of these findings equally applies. Not only is MLI a wholly-owned subsidiary of BAC, the entities share at least two corporate board members; MLI's financial statements are consolidated into those of BAC (suggesting that BAC has unfettered access to MLI's most sensitive financial records); and BAC dictates various corporate risk, strategy, and compensation policies that are implemented locally by MLI. The BAML Entities also maintain a unified global corporate presence via common branding, a website, client portals, and – as demonstrated here, a Prime Brokerage Agreement pursuant to which clients may execute trades across the entire BAML global ecosystem via a single, contractual point of contact and brokerage account.[6] *See DeSmeth v. Samsung America, Inc.*, 92 Civ. 3710, 1998 WL 74297, at *10 (S.D.N.Y. Feb. 20, 1998) ("The Samsung companies may not hold themselves out as united for some purposes and unconnected

---

[6] Given BAC's categorical refusal to produce any documents or proffer 30(b)(6) witness testimony in response to the BAC Subpoena concerning its control of MLI and its records, BAC should be precluded from offering any such evidence in defense of its opposition to the instant motion to compel.

for others.") The Court should therefore find, at a minimum, that BAC has access to, and the practical ability to obtain, records and information in MLI's direct custody concerning the December 15 Transactions. Consequently, BAC must produce such records and information to MWC pursuant to a lawfully-issued subpoena.

### 2.      MLPro Has Possession, Custody, or Control Over MLI's Records

Similarly, MLI's sister entity MLPro, which (i) served as MLI's agent vis-a-vis the Prime Brokerage Agreement, (ii) communicated with MLI to coordinate trade origination and clearance, and (iii) maintained MWC's brokerage account that enabled access across the BAML global ecosystem, has control over – or at least, at a minimum, access to and the ability to obtain – documents in MLI's possession concerning the identity of the outside counterparty to the December 15 Transactions.

While case law concerning sister entities under common control is limited, the leading Third Circuit decision *Gerling Intern. Ins. Co. v. C.I.R* surveyed relevant decisions and found that that they "follow the same pattern" as cases involving a subsidiary and its corporate parent. 839 F.2d 131, 141 (3d Cir. 1988) ("Where the relationship is thus such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in the litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party."). *See also First National City Bank v. Internal Revenue Service*, 271 F.2d 616, 618 (2d Cir. 1959) (where there was access to the documents between bank branches when the need arose in the ordinary course of business, there was "sufficient control" to cause them to be produced in response to a subpoena); *Cooper Indus.*, 102 F.R.D. at 919.

Thus, the "requisite control" has been found "where the litigating corporation had acted with its sister in effecting the transaction giving rise to suit and is litigating on its behalf." *Gerling*

13

*Intern. Ins. Co.* 839 F.2d at 141 (citing *Alimenta (U.S.A.), Inc. v. Anheuser-Busch Companies,* 99 F.R.D. 309, 313 (N.D. Ga. 1983) (sister entities had "acted 'as one' in the transaction at issue" and the sister possessing the documents had assisted its sibling in litigating the case)). *See also Huang v. iTV Media, Inc.*, 13 Civ. 3439, 2017 WL 706194, *8 (E.D.N.Y. Feb 22, 2017); *Merck Co. v. Sandoz, Inc.*, 10 Civ. 1625, ECF No. 62, at 11-12 (D.N.J. Nov. 23, 2010) (requiring United States-based Sandoz entity to produce documents held by foreign sister entities where the entities "acted together" in seeking approval for a generic drug); *Sanofi-Aventis v. Sandoz, Inc.*, 272 F.R.D. 391, 396 (D.N.J. 2011) (same).

Courts have also repeatedly required agents to produce documents in the direct custody of their principals. *See JPMorgan Chase Bank v. Winnick*, 228 F.R.D. 505, 506 (S.D.N.Y. 2005) (requiring agent to produce documents in possession of principal); *Compagnie Francaise D'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 35 (S.D.N.Y. 1984) (holding agent organization required to produce documents held by its principals); *Soletanche and Rodio, Inc. v. Brown Lambrecht Earth Movers, Inc.*, 99 F.R.D. 269, 272 (N.D. Ill. 1983) (same); *Ghana Supply Commission v. New England Power Co.*, 83 F.R.D. 586, 592 (D. Mass. 1979) (same).

Here, in connection with the December 15 Transactions, MLPro was MLI's agent vis-à-vis MWC in the December 15 Transactions, and it served as the central point of contact between MWC and all the BAML Entities for transactions occurring pursuant to the Prime Brokerage Agreement. MLPro maintained MWC's brokerage account from which the Casino bonds sold by MLI originated, and into which the cash collected by MLI in exchange for those bonds returned. MLPro also appears to have participated, along with MLI, in sourcing the borrowed bonds that MWC traded in the December 15 Transaction. Furthermore, MLPro has testified (i) that MLPro

and MLI do communicate and share information concerning transactions in the course of business; (ii) that MLPro has the ability to obtain information concerning brokerage transactions from BAML sources outside of MLPro's siloed computer terminals; and (iii) that MLPro is not aware of any internal BAML policy or external law that would prevent MLPro from accessing the MLI information that MWC's subpoena requests. Further, by furnishing a letter proposing to produce the requested documents in response to an order issued by the appropriate UK authority, MLI appears to have acted in concert with MLPro's and BAC's anticipated opposition to the instant motion.

For all of these reasons, this Court should order MLPro to produce the records and information in MLI's direct custody concerning the December 15 Transactions.

**B.**   **All Relevant Factors Weigh In Favor of Compelling Production**

Despite the absence of any reasonable argument that BAC and MLPro do not have possession, custody, or control over – or at least access to and a practical ability to obtain – records and information in MLI's direct custody, MWC anticipates that BAC and MLPro will still contend: (1) that MWC should be required to obtain the records from MLI in London via international discovery mechanisms rather than from BAC and MLPro, and (2) that production of the records by the U.S.-based entities would be inconsistent with UK law.

**1.**   **Foreign Discovery Is Not Required, and Its Success Is Uncertain**

As an initial matter, MWC should not be required to forego the discovery from BAC and MLPro to which it is otherwise entitled simply because such documents and information are *also* in the custody of BAC's foreign subsidiary. Just as crucially, however, the foreign discovery efforts that BAC and MLPro are likely to advocate for here are not certain to succeed – and, at a minimum, they are not certain to succeed within the short time frame necessary for MWC to avoid

15

dismissal of its lawsuit against the John Doe Defendants.

Indeed, in order to obtain records from MLI via the Hague Convention, MWC must (1) seek an order issuing a Letter of Request from Judge Kim in the Northern District of California, (2) present that Letter of Request to the appropriate UK authority and seek issuance of a UK discovery order, (3) serve the UK discovery order upon MLI in London, and (4) litigate successfully against any objections that MLI might pose to such an order in the UK. (Fletcher Decl. ¶ 19.) MWC is advised by UK-counsel that – under even the best of circumstances – this process can take many weeks or months. (*Id.*) Moreover, based on the representations of MWC's London-based counsel, it is not clear that the UK Senior Master in charge of domesticating foreign discovery requests even has the authority to "execute letters of request issued for the purpose of obtaining pre-trial discovery of documents" without a trial date imminent. *Panaviotou v. Sony Music Ltd.*, Ch. 1992 P. No. 8711 at 151-52 (1993) (attached to Fletcher Decl. as Ex. P). *See also State of Minnesota v. Philip Morris Inc.*, 1998 I.L.Pr. 170, 175 (Eng. Ct. App. 1997) (attached to Fletcher Decl. as Ex. Q) (noting that evidence sought for a preliminary purpose, such as "the process of pre-trial discovery," raises concerns of improper "fishing"). Further, even if the UK authority does issue an order directing MLI to produce the records in its possession, there is no guarantee that MLI will actually agree to do so or that successfully litigating any objections in the UK will be expeditious.

If MWC's lawsuit in the Northern District of California is to survive, MWC simply cannot afford to shoulder such uncertainty or delay – nor should it be required to where it is legally entitled to obtain the requested documents from MLPro and BAC and the immediate urgency is the result of MLPro's and BAC's lengthy campaign of obstruction and delay in response to the many requests and court-authorized subpoenas that MWC has served on the BAML Entities.

16

2.     **No Conflict of Laws Exists; Even if One Did, the Comity Analysis Favors Production**

BAC's letter objecting to the BAC Subpoena vaguely raised "UK privacy rules and other cross-border regulations" as an obstacle to BAC's production of documents in MLI's immediate custody. (Fletcher Decl. Ex. I.) However, there is no evidence that the documents that MWC requests here are covered by any such privacy rules, or that cross-border transfer of those documents is barred any such (unspecified) regulation.[7] *See British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 90 Civ. 2370, 2000 WL 713057, at *8 (S.D.N.Y. June 2, 2000) ("[T]he party relying on foreign law has the burden of showing that such law actually bars [the] production" at issue.)

The European Union's General Data Protection Regulation ("GDPR"), which the UK has implemented,[8] applies only to "personal data" of natural persons. GDPR Art. 4(1). Here, BAC has presented no evidence or any other reason to conclude that the unknown outside counterparty (or counterparties) to the December 15 Transactions is a *natural person* as opposed to a business entity.[9] Therefore, the GDPR cannot apply to the records at issue in MWC's subpoena requests. What's more, even if the GDPR does apply, that law provides an exception for data transferred in furtherance of the exercise or defense of legal claims. GDPR Art. 49(1)(e). *See also In re Mercedes-Benz Emissions Litig.*, 2:16 Civ. 881, at *4 (D.N.J. Nov. 4, 2019) ("Defendants have not

---

[7] Indeed, MLPro's corporate designee testified that MLPro is unaware of any such rule, law, or regulation. (MLPro Tr. 104:23-105:4 and 105:21-106:6.)

[8] In anticipation of the UK's possible departure from the European Union, the UK granted royal assent to the Data Protection Act 2018, which, in part, mirrors the GDPR standards. *See generally* https://en.wikipedia.org/wiki/General_Data_Protection_Regulation#United_Kingdom_implementation and https://en.wikipedia.org/wiki/Data_Protection_Act_2018.

[9] Given that the December 15 Transactions involved approximately $18 million in securities trades, it would seem highly unlikely that the counterparty was a natural person rather than an institution or other entity.

pointed to any prior enforcement actions by the EU focused on violations in the litigation context.")

The absence of an actual foreign conflict ends the inquiry and mandates production. Regardless, even where an actual and legitimate conflict of laws exists, courts perform a comity analysis to determine the weight to be given to the foreign jurisdiction's law. *Tiffany (NJ) LLC*, 276 F.R.D. at 151 (citing *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996)). "In determining whether to order discovery of documents and information located abroad, courts in this Circuit follow the approach set forth in the Restatement (Third) of Foreign Relations Law § 442(1)(c) and consider: (1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the U.S.; (4) the availability of alternative means of retrieving the information; and (5) the extent to which noncompliance with the request would undermine important interests of the U.S., or compliance with the request would undermine the important interests of the state where the information is located." *Id.* (citing *Gucci America, Inc. v. Curveal Fashion*, 09 Civ. 8459, 2010 WL 808639 at *2 (S.D.N.Y. Mar. 8, 2010)). "In addition, courts in the Second Circuit may also consider the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery." *Id.* Here, each of these factors favors production of MLI's records.

First, the records in MLI's possession are crucial to the vindication of MWC's rights, because they are the only documents currently known to MWC that can identify the John Doe Defendants in this action. Without those records, MWC's lawsuit is likely to be dismissed, because MWC will not be able to identify the John Doe Defendants and thus will not be able to effect service upon those defendants. *See id.* (*"Because the Banks' records could potentially reveal the*

identities of those involved in the counterfeiting operation, they are important to plaintiffs' claims.").

Second, the documents in MLI's possession are limited to no more than a small handful of transaction records that identify the name, address, and contact information of the outside counterparty purchaser(s) in the December 15 Transactions – which transactions were, themselves, just four, easily-identified, individual bond trades that occurred on a specific date in history, *i.e.*, December 15, 2015. It is difficult to imagine a more targeted request than this.

Third, as discussed above, the December 15 Transactions originated in the United States, when Casino bonds located in MWC's New York-based MLPro brokerage account were transferred by MLPro to MLI for trade execution, and the transactions settled and cleared when the cash received by MLI in exchange for the Casino bonds was transferred back to MLPro for depositing in MWC's New York-based account. Although the documents in question may be in MLI's immediate custody in London, BAC refused to proffer a witness to testify concerning BAC employees' ability access to those records, and MLPro's corporate designee did not attempt to obtain the records prior to his deposition.

Fourth, as discussed above, although MWC has already begun efforts to pursue discovery from MLI directly in the UK concurrently with this motion, it is by no means certain that such foreign efforts will succeed. Indeed it is entirely possible that the relevant UK authority will determine that it lacks the power to issue a discovery order at all, because, in the UK, pre-trial discovery can be considered improper "fishing." And, even if MWC is ultimately successful in the UK, the inherent length of the foreign process may result in the dismissal of MWC's lawsuit in the interim.

Fifth, the United States has a strong interest in enforcing its laws, and in particular its

securities laws. Courts in this District have repeatedly found that "the United States interest in fully and fairly adjudicating matters before its courts . . . outweighs [a foreign country's] interest in protecting the confidentiality of its banking customers' records." *Curveal Fashion*, 2010 WL 808639, at *7. *See also Ssangyong Corp. v. Vida Shoes Int'l, Inc.*, 03 Civ. 5014, 2004 WL 1125659, at *11 (S.D.N.Y. May 20, 2004) (explaining that United States' interest is implicated in a variety of cases, including those "where a litigant acts as a private attorney general" and "civil commercial litigation"); *Minpeco, S.A. v. Conticommodity Servs. Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987) (noting that it is "difficult to imagine a private commercial lawsuit which could be more infused with the public interest" than those in which parties act as "private attorney generals" in enforcing, *e.g.*, United States antitrust, commodities, and racketeering statutes).[10]

Sixth, the hardship asserted by BAC in its objection letter is pure fiction. The records themselves amount to no more than a small handful of documents, and to the extent that BAC or MLI suggest that they will suffer some adverse regulatory action based on the cross-border transfer of those documents to the United States, "the party relying on foreign law has the burden of showing that such law actually bars [the] production" at issue. *British Int'l Ins. Co. Ltd*, 2000 WL 713057 at *8. *See also In re Mercedes-Benz Emissions Litig.*, 2:16 Civ. 881 at *4 ("Defendants have not pointed to any prior enforcement actions by the EU focused on violations in the litigation context.") Given the absence of any conflicting foreign law and BAC's anticipated inability to demonstrate enforcement action by UK authorities arising in a similar situation, BAC cannot make

---

[10] To the extent that BAC argues that the UK has an interest in protecting the privacy of bank "customers," MWC hastens to point out that the BAML Entities' customer *here* was MWC, via the Prime Brokerage Agreement. Neither BAC nor MLPro have furnished any evidence suggesting that the John Doe Defendants also had a contractual client relationship with MLI or any other of the BAML Entities. Regardless, even if such a relationship did exist, the United States' interest in enforcing its laws would outweigh such interests. *See Curveal Fashion*, 2010 WL 808639, at *7.

such a showing here.

Finally, the BAML Entities' lengthy history of delay and refusal even to respond to court-authorized subpoenas calls into question MLPro's and BAC's good faith. This delay and obstruction has included: (i) MLPro's delay of many weeks during June and July 2019 in allegedly searching for documents responsive to MWC's First MLPro Subpoena  (Fletcher Decl. ¶ 7); (ii) MLPro in-house counsel's misrepresentation to MWC's counsel that MLPro does not possess records or information related to the December 15 Transactions, whereas MLPro's corporate designee later testified that MLPro *does* possess such records (*Compare id. with* MLPro Tr. 48:5-48:19, 73:4-73:20, 94:21-95:8, and 96:13-96:17); (iii) MLPro's disregard of MWC's initial requests to furnish a FRCP 30(b)(6) witness, notwithstanding the inclusion of a deposition request in the First MLPro Subpoena (Fletcher Decl. ¶¶ 7 and 9); (iv) MLPro's proffer of a corporate designee who was woefully unprepared to testify about multiple noticed topics, and whose preparation was limited, by and large, to making a single email query to a nameless BAML email address for information concerning the identity of the BAML Entity to which MLPro transferred the Casino bonds that were traded in the December 15 Transactions (MLPro Tr. 29:10-29:24, 31:13-31:17, 87:16-89:8, 95:20-96:17, 109:12-110:5, and  111:21-112:19); (v) the MLPro corporate designee's admission that *he didn't even ask* anyone, anywhere at the BAML Entities whether or not he could be provided with records or information concerning the identity of the outside counterparty to the December 15 Transactions (MLPro Tr. 57:1-57:6, 58:25-59:10, 106:24-107:4, 109:12-110:5, and 114:18-116:13); (vi) post-deposition, MLPro's refusal to produce certain documents related to the December 15 Transactions that MLPro's designee testified *are* in MLPro's possession (Fletcher Decl. ¶ 15); and (vii) BAC's repeated refusal to proffer a FRCP 30(b)(6) witness concerning noticed topics germane to its objection to the BAC

Subpoena, *e.g.*, (a) BAC's possession, custody, and control over – and access to – documents and information in MLI's possession, and (b) BAC's corporate relationship with MLI. (*Id.* ¶¶ 10, 13-15.)

Given this history of non-compliance and obstruction, any claim by BAC and MLPro that the above violations – several of which could justify contempt sanctions pursuant to FRCP 45(g) – resulted from rank organizational inertia as opposed to active bad faith should not be credited.

## **CONCLUSION**

For all the foregoing reasons, MWC respectfully requests an order: (1) compelling BAC and MLPro to produce, prior to February 17, 2020, all documents called for by the MLPro Subpoena and BAC Subpoena, and in particular those records in MLI's immediate custody which identify, *inter alia*, the name, address, and contact information of the counterparty purchasers in the December 15 Transactions; and (2) awarding such other relief as the Court may deem just and proper.

Dated: New York, New York
       December 10, 2019

**FLETCHER LAW, PLLC**

By: Jordan Fletcher
jordan@fletcherlaw.co
154 Grand Street
New York, New York 10013
(212) 320-8945
*Counsel for Plaintiff Muddy Waters Capital LLC*