# **EXHIBIT E**

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | |
|---|---|
| Muddy Waters Capital LLC | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.    3:19-cv-1293 |
| John Does 1-10 | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:           Merrill Lynch Professional Clearing Corp.
                  c/o CT Corporation, 28 Liberty Street, New York, NY 10005

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

Merrill Lynch Professional Clearing Corp. is requested to designate the person(s) most knowledgeable and prepared to testify on its behalf concerning the subject matter described in Exhibit A hereto.

| Place: Fletcher Law, PLLC, 154 Grand Street, New York, NY 10013, or such other location as designated by issuing counsel. | Date and Time: 11/11/2019 at 9:00 am |
|---|---|

         The deposition will be recorded by this method:    Stenographically and/or video.

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

         The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    October 17, 2019

| | | |
|---|---|---|
| *CLERK OF COURT* | OR | *[signature]* |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Muddy Waters Capital, LLC
, who issues or requests this subpoena, are:

Jordan Fletcher, Fletcher Law, PLLC, 154 Grand Street, New York, NY 10013; (212) 320-8945; jordan@fletcherlaw.co

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   3:19-cv-1293

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

The following definitions, which include and incorporate by reference the definitions required by Fed. R. Civ. P. 34(a), are applicable to these requests.

## DEFINITIONS

1.    **Plaintiff**. The term "Plaintiff" means the plaintiff in this action, Muddy Waters Capital LLC and its client/advisee/assignee MLAF, LP ("MLAF").

2.    **You**. The term "You" or "MLPro" means Merrill Lynch Professional Clearing Corp. and any and all related entities collectively defined as the "BofAML Entities" in a certain Prime Brokerage Account Agreement dated November 4, 2015 between and among MLAF and Plaintiff, on the one hand, and You, on the other.

3.    **Prime Brokerage Agreement**. The term "Prime Brokerage Agreement" means that certain Prime Brokerage Account Agreement dated November 4, 2015 between and among MLAF and Plaintiff, on the one hand, and You, on the other. A copy of the Prime Brokerage Agreement is attached hereto as **Attachment 1**.

4.    **December 15 Transactions**. The term "December 15 Trades" means certain short sale securities transactions involving bonds of French retailer Casino Guichard-Perrachon, S.A. that were arranged, facilitated, and/or executed on Plaintiff's and MLAF's behalf by You pursuant to the Prime Brokerage Agreement on or about December 15, 2015, and which have been referenced, in part, in account statements provided by You to Plaintiff, using the following transaction IDs/information:

      a.      CASP 3.580 02/07/25 '24 MTN: Trans ID 20402477

      b.      CASP 4.498 03/07/24 '23 MTN: Trans ID 20402475

      c.      CASP 4.498 03/07/24 '23 MTN: Trans ID 20402476

      d.      CASP 4.498 03/07/24 '23 MTN: Trans ID 20402478

The December 15 Transactions are also identified by the handwritten letters "D" through "G" on the account statement attached hereto as **Attachment 2**.

     5.     **Shorted Casino Bonds**. The term "Shorted Casino Bonds" means the specific securities that were sold by Plaintiff in the December 15 Transactions.

     6.     **Communication**.  The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

     7.     **Document.**  "Document" means any written, recorded, or graphic material of any kind, whether prepared by you or by any other person, that is in your possession, custody, or control. The term includes agreements; contracts; letters; telegrams; inter-office communications; memoranda; reports; records; instructions; specifications; notes; notebooks; scrapbooks; diaries; plans; drawings; sketches; blueprints; diagrams; photographs; photocopies; charts; graphs; descriptions; drafts, whether or not they resulted in a final document; minutes of meetings, conferences, and telephone or other conversations or communications; invoices; purchase orders; bills of lading; recordings; published or unpublished speeches or articles; publications; transcripts of telephone conversations; phone mail; electronic-mail; ledgers; financial statements; microfilm; microfiche; tape or disc recordings; and computer print-outs.  A draft or non-identical copy is a separate document within the meaning of this term.

        The term "document" **also includes electronically stored information ("ESI")** on operational systems including accounting, financial, distribution, or manufacturing systems; **E-mail; Instant Messages (IM); Web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata**; computer databases (i.e., Access); erased, fragmented or damaged data; Blackberry data; and anything stored on computer or other electronic means located

on or in, but not limited to cache memory; optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); PDAs, Blackberries and Palm Pilots; cell phones; IM tools; or USB drives. Any such document is to be produced in a reasonably legible and usable form.

Without limitation on the term "control" as used herein, a document is deemed to be in your control if you have the right to secure the document or a copy thereof from another person.

8.     **Tangible Things**.  The term "tangible things" means corporal items or property, perceptible to the senses.

9.     **Identify (with respect to persons)**.  When referring to a person, "to identify" means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

10.     **Identify (with respect to business entities)**.  When used with reference to an entity such as a partnership, joint venture, trust, limited liability company, or corporation, "to identify" means to give, to the extent known the full legal name of such entity, each name under which such entity does business, the entity's street address, the entity's email address and telephone number, the identity of the chief operating officer, manager, trustee or other principal or representative and the identity of those persons employed by or otherwise acting for such entity who are known or believed to possess the knowledge or information responsive to the interrogatory for which the entity was identified.

11.     **Identify (with respect to documents)**.  When referring to documents, "to identify" means to give, to the extent known, the (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s) and recipient(s).   In the alternative, the responding party may produce the documents and state the Bates stamp production numbers of such documents.

12.     **Parties**. The terms "plaintiff" and "defendants" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.  This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

13.     **Person**. The term "person" is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

14.     **Concerning**. The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

15.     **All/Any/Each**. The terms "all," any," and "each" shall each be construed as encompassing any and all.

16.     **And/Or**.  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

17.     **Number**. The use of the singular form of any word includes the plural and vice versa.

## DEPOSITION TOPICS

A.     The Prime Brokerage Agreement and MLPro's role as a party thereto and agent for all

entities defined as the "BofAML Entities" thereunder.

B.      The securities trades and logistics of such trades – including the individuals and entities participating in such trades, the roles and responsibilities of participating individuals and entities, and the communications between and among such individuals and entities – that occurred pursuant to the Prime Brokerage Agreement.

C.      MLPro's role and responsibility in connection with trades that occurred pursuant to the Prime Brokerage Agreement.

D.      MLPro's role in and knowledge concerning the December 15 Transactions.

E.      The logistics, entities, and individuals – including the arranging, execution, clearance, and counterparties – involved in the December 15 Transactions.

F.      The custodian(s) and location(s) of all transaction records generated by MLPro and any other of the "BofAML Entities" concerning the December 15 Transactions.

H.      MLPro's access to, custody, and/or control over trade or other transaction records generated by any of the "BofAML Entities" concerning the December 15 Transactions.

H.      MLPro's access to, custody, and/or control over trade or other transaction records generated by (i) Merrill Lynch International and (ii) BofA Securities, Inc. concerning the December 15 Transactions.

I.      MLPro's knowledge of or access to knowledge concerning the identity(ies) of any outside counterparties involved in the December 15 Transactions, including any outside third parties with whom Merrill Lynch International traded in connection with the December 15 Transactions.

# **Attachment 1**

DRAFT

# Prime Brokerage Account Agreement

| Date 11/04/2015 | Account Number(s) |
|---|---|

| Account Title MLAF LP | |

This agreement (including all terms, schedules, annexes, supplements and exhibits attached hereto, this **"Agreement"**) is entered into between Customer specified on the signature page hereof (**"Customer"**) and Merrill Lynch Professional Clearing Corp. (**"Prime Broker"**), on behalf of itself and as agent for the BofAML Entities. This Agreement contains the terms and conditions upon which Prime Broker agrees to open and maintain one or more accounts (**"Prime Broker Account"**) for margin, execution, settlement and other products or services, and otherwise to transact business with Customer.

Prime Broker and/or other BofAML Entities may provide services under this Agreement which include effecting transactions on Customer's behalf and extending credit to Customer. Each of the BofAML Entities is intended to be a beneficiary of Customer's agreements, representations and covenants herein, as well as of Prime Broker's rights under this Agreement. Except as otherwise specified, capitalized terms are defined in Section 17.

## Section 1: Margin.

(A) All extensions of credit, debit balances, loans and Obligations are repayable immediately upon demand unless otherwise expressly agreed in writing. Customer agrees to, at all times, (i) maintain in, and immediately upon demand furnish for deposit to, any Account, or otherwise provide to the BofAML Entities in a manner satisfactory to the BofAML Entities, such securities or other assets as the BofAML Entities may require in light of outstanding Obligations and (ii) comply with Prime Broker's risk policies as notified by Prime Broker. Such margin requirements and risk policies shall be set from time-to-time by Prime Broker in its sole and absolute discretion, and such margin requirements may exceed any minimum margin requirements imposed by Applicable Law. The assets that Prime Broker will accept as collateral, credit support, or margin, as well as their value, shall be as determined by Prime Broker from time to time in its sole and absolute discretion. Except as otherwise provided in Section 1(B), nothing in this Agreement shall affect any right of Prime Broker or any other BofAML Entity to require margin or other Collateral in connection with any other Contract.

(B) Where Prime Broker makes a demand for margin or Collateral pursuant to this Agreement, the calculation of which takes into account a transaction which is subject to the terms of another Contract, the provisions of such other Contract governing the provision of collateral, credit support or margin (however defined, including, without limitation, (i) the amount of collateral, credit support or margin required to be furnished by Customer, (ii) the timing and delivery requirements of such collateral, credit support or margin (including without limitation any minimum transfer amounts), (iii) the type and value of the assets that are acceptable as collateral, credit support or margin, (iv) any rights of Customer to dispute the valuation of such collateral, credit support or margin and (v) any rights of Customer to demand the delivery or return of collateral, credit support or margin) shall be disapplied in their entirety in respect of such transaction and the transfer of collateral, credit support or margin, and the provisions of this Agreement shall control and supersede the terms of such other Contract; *provided that,* the provisions of this Section 1(B) shall not disapply the provisions of any Contract governing the initial purchase of securities under any repurchase transaction.

## Section 2: Credit Protection.

(A) Grant. Customer pledges, charges by way of first fixed charge and grants to each BofAML Entity (in the case of any Collateral that is situated or is deemed to be situated in the United Kingdom, with full title guarantee) a security interest in and a continuing lien on, grants to each BofAML Entity a right of setoff against, and assigns to each BofAML Entity by way of security, all Collateral for the prompt and complete payment and performance when due of all Obligations, whether now existing or hereafter arising. Each BofAML Entity notifies each other BofAML Entity of its security interest in the Collateral and each BofAML Entity acknowledges such notice and consents to such security interest. The BofAML Entities' security interest in the Collateral shall (i) remain in full force and effect until the payment and performance in full of all of Customer's Obligations and the termination of this Agreement, (ii) be binding upon Customer, its successors and permitted assigns, and (iii) inure to the benefit of, and be enforceable by, each of the BofAML Entities and their successors, transferees and assigns. The security interest created under this Agreement shall be in addition and without prejudice to any other security interest, guarantee, indemnity, right or remedy of whatever nature which any BofAML Entity may now or at any time have in respect of any Obligation. The BofAML Entities and Customer each acknowledge and agree that each Account to which Collateral is credited and that is maintained by a securities intermediary is a securities account, and all property and assets held in or credited from time to time to any Account (other than any commodity contract) shall be treated as a financial asset for purposes of Article 8 of the NYUCC; *provided that,* any such account may also be a deposit account (within the meaning of Section 9-102(a)(29) of the NYUCC) or a commodity account (within the meaning of Section 9-102(a)(14) of the NYUCC).

(B) Priority. Subject to Section 2(E), the security interests of the BofAML Entities in any Collateral shall rank in such order of priority as the BofAML Entities may agree from time to time, *provided that,* in the event that Prime Broker is obliged by Applicable Law to maintain a first priority lien in Collateral held by Prime Broker, or where Prime Broker would suffer adverse regulatory capital, reserve or other similar costs (**"Adverse Costs"**) if it did not maintain a first priority lien in such Collateral, Prime Broker's interest in the applicable Collateral shall have priority over that of the other BofAML Entities to the extent required to satisfy requirements of Applicable Law or avoid such Adverse Costs.

(C) Control by BofAML Entities. Each BofAML Entity that holds Collateral holds such Collateral for itself and also as agent and bailee for all other BofAML Entities and each BofAML Entity which has control of Collateral has such control for its own benefit and for the

benefit and on behalf of each other BofAML Entity. Each BofAML Entity shall, without Customer's further consent, comply with any entitlement orders, instructions, or directions originated by another BofAML Entity with respect to the Collateral, including, without limitation (i) any entitlement orders with respect to any securities account constituting Collateral or to which any Collateral is credited or any Collateral credited to such an account, (ii) any instructions directing disposition of the funds in a deposit account constituting collateral or to which Collateral is credited, and (iii) any direction to apply any value distributed on account of any commodity contract constituting Collateral or any commodity account to which Collateral is credited, in each case subject to the consent of each other BofAML Entity.

(D) Release of Collateral.  Notwithstanding anything to the contrary herein or in any other Contract, while any Obligations remain outstanding, no BofAML Entity shall be required to, or agree to, (a) comply with instructions from Customer to release Collateral to Customer or a third party unless (i) Customer is in compliance with all Obligations and Contracts, (ii) after such release, all Obligations and Contracts will be collateralized in an amount not less than the amount required by the BofAML Entities, and (iii) the BofAML Entities have given prior consent, or (b) pay any net sum due to Customer following the application of the close-out and netting or enforcement provisions under any Contract without the prior consent of the BofAML Entities.

(E) Transfer of Collateral between BofAML Entities.  Each BofAML Entity is authorized, but is not obligated, to use, apply, credit or transfer any and all Collateral interchangeably between the BofAML Entities at any time, and without prior notice to Customer (including by transfer to the proprietary account of any BofAML Entity in connection with any master repurchase agreement between Customer and any BofAML Entity, in which case such assets shall be deemed additional margin or purchased securities, as the case may be, as defined in such master repurchase agreement). Under no circumstances shall any Collateral delivered, transferred or deemed delivered or transferred to a BofAML Entity in connection with a Contract be transferred or released if the BofAML Entities determine that such transfer or release would render any of them undersecured or undermargined with respect to any Obligations, or if an Event of Default has occurred, or if any such application, transfer or release would be contrary to Applicable Law.

(F) Power of Attorney.  Customer shall take all steps reasonably requested by the BofAML Entities to establish and maintain the perfection and, as appropriate, first priority of the BofAML Entities' security interest in the Collateral. Customer shall pay the fees for any filing, registration, recording or perfection of any security interest contemplated by this Agreement and pay any and all Taxes and levies imposed on the Collateral by any authority. In addition, Customer irrevocably and by way of security authorizes and appoints each of the BofAML Entities as its attorney-in-fact (with full power of substitution and delegation), on its behalf and in its name or otherwise, when and as the BofAML Entities think fit to do all acts (i) as may be required to be done under this Agreement, including to perfect the security interests in, and to provide for any BofAML Entity to have control of, or realize upon any rights of any BofAML Entity in, any or all of the Collateral, including actions required to execute, sign, seal and deliver any documents which may be required for such purposes and (ii) as may be required for the full exercise of the powers conferred hereby, including upon an Event of Default. Customer ratifies and confirms and agrees to ratify and confirm whatever any BofAML Entity shall do in the exercise or purported exercise of the power of attorney granted by this Section 2(F).

**Section 3: Fees and Costs.** Customer shall pay to Prime Broker, on demand, Prime Broker's reasonable costs (including, without limitation, disbursements and Taxes specifically related to a transaction and any transfer costs in connection with termination of this Agreement), together with Prime Broker's brokerage commissions, mark-ups, fees and interest charges (including for lending securities to Customer and otherwise financing securities or other positions or strategies) as charged by Prime Broker to Customer from time to time, and any third party fees which Prime Broker shall pass through to Customer (e.g., clearing broker fees), in each case in respect of the services contemplated by this Agreement. Fees with respect to short positions may be disclosed to Customer at the time a short position is established or may be imposed or increased from time to time in light of changing market conditions, and Customer agrees to pay such fees at Prime Broker's then-prevailing rates. Customer acknowledges receipt of Prime Broker's Truth-in-Lending disclosure statement. Customer authorizes the BofAML Entities to debit any Account to pay themselves or others for fees, commissions, markups and other charges, expenses and Obligations.

**Section 4: Taxes.**

(A) Transfer Taxes.  Customer shall pay any present or future transfer taxes, stamp taxes, documentary taxes and all similar costs with respect to the transfer of securities under any Contract.

(B) Other Taxes.  All money payable (including fees payable pursuant to Section 3) or Collateral deliverable by Customer to any BofAML Entity under any Contract shall be paid or delivered, as applicable, free and clear of, and without withholding or deduction for, any Taxes, unless the withholding or deduction of such Taxes is required by Applicable Law. If any Taxes are required to be withheld or deducted, Customer shall pay such additional amounts or deliver such further Collateral as necessary to result in such BofAML Entity receiving the same amounts of money or Collateral as it would have if no such Taxes had been required to be withheld or deducted; provided, however, that Customer shall not be required to pay such additional amounts or deliver such further Collateral on account of Taxes imposed on or measured by such BofAML Entity's overall net income that are imposed by a jurisdiction where such BofAML Entity is a tax resident, unless such Taxes would not have been imposed on such BofAML Entity but for (i) the mere receipt of payment by such BofAML Entity from Customer or (ii) the performance by such BofAML Entity of its obligations under any Contract.

(C) Prime Broker Authorized to Withhold.  Each BofAML Entity is authorized to withhold Taxes from any payment or transfer made hereunder and remit such Taxes to the relevant taxing authorities to the extent required by law, and shall not pay any additional amounts in respect of such withheld amounts.

**Section 5: Representations, Warranties, Covenants and Agreements.** Customer represents, warrants, covenants and agrees, as of the date hereof, and on each date on which an Obligation is in existence or a transaction or Contract is effected for any Account, that:

(A) Customer is duly organized and validly existing under the laws of its jurisdiction of organization and has the power and authority to own its assets and to conduct the business it conducts;

(B) Customer has the power and authority to execute, deliver, and perform its obligations under this Agreement and each Contract, and this Agreement and each Contract has been duly executed and delivered by Customer and, if Customer is a partnership, by the general partner(s) on behalf or for the benefit of the partnership and

-2-

each of its partners from time to time, present and future), and constitutes a valid and binding agreement of Customer, enforceable in accordance with its terms, subject to applicable bankruptcy and similar laws affecting creditors' rights and general principles of equity. The execution, delivery and performance by Customer of this Agreement and each Contract and the fulfillment of the Obligations do not and will not result in a breach or violation of any Applicable Law, order, or award binding on Customer or its property, or Customer's organizational documents, or any material contract or other instrument binding on or affecting Customer or any of its property;

(C) No consent of, authorization or other action by, notice to, or filing with, any governmental authority, self-regulatory organization or any other person is required that has not already been obtained for (i) Customer to execute, deliver, and perform under this Agreement, or (ii) the exercise by any of the BofAML Entities of the rights or remedies provided for in this Agreement, including rights and remedies in respect of the Collateral;

(D) In entering into this Agreement, Customer is not relying upon any representation, warranty or other statement of Prime Broker whatsoever, other than express representations or warranties that Prime Broker has made in this Agreement. Customer (i) is knowledgeable and experienced regarding any transactions that it enters into pursuant to this Agreement or any other Contract, (ii) is capable of evaluating the terms of this Agreement and the Contracts, and the merits and risks of such transactions, and (iii) has obtained or will obtain any requisite independent advice in respect of such transactions. Customer has determined, based on its own independent review, that the Contracts and the transactions contemplated thereby are fit, proper and suitable for it and that it is capable of bearing any related economic risks;

(E) Customer or its Executing Broker, in the case of sales by Customer, and the seller or Customer's Executing Broker, in the case of purchases by Customer, will be solely and exclusively responsible for delivery of prospectuses and related disclosure documents with respect to securities registered under the Securities Act. In either event, Customer agrees that Prime Broker shall not be obliged to deliver any prospectus or related disclosure document to any purchaser from Customer or to deliver or forward any prospectus or related disclosure document to Customer that Prime Broker may receive (via electronic means or otherwise) in any capacity;

(F) Customer is the lawful owner of all Collateral. All Collateral shall be free and clear of all liens, security interests, mortgages, claims, encumbrances and transfer restrictions, except such as are created under this Agreement and other liens and security interests in favor of BofAML Entities. Customer will not cause or allow any of the Collateral to be subject to any liens, security interests, mortgages or encumbrances of any nature other than those in favor of the BofAML Entities. No person (other than Customer or a BofAML Entity) has an interest in the Prime Broker Account, any Accounts, or any Collateral or other property held therein or credited thereto. Collateral consisting of securities shall be delivered in good deliverable form (or a BofAML Entity shall have the power to place such securities in good deliverable form) in accordance with the requirements of the primary market or markets for such securities;

(G) Unless Customer otherwise informs Prime Broker in writing, Customer is not an affiliate (as defined in Rule 144(a)(1) under the Securities Act) of the issuer of any Collateral, and no Collateral is subject to any legal or contractual restrictions on sale for the account of Customer;

(H) Customer's financial statements or similar documents previously or hereafter provided to Prime Broker (i) fairly present (a) the financial condition of Customer as of the date of such financial statements and (b) the results of its operations for the period for which such financial statements are applicable, (ii) have been prepared in accordance with generally accepted accounting principles and with its organizational or constituent documents, and (iii) if audited, have been certified without reservation by a firm of independent public accountants. Since the date of its most recent audited financial statements, there has been no material adverse change in the business, financial condition or results of operations of Customer, except as disclosed in writing to Prime Broker;

(I) At all times Customer has been, is, and will be, in compliance with Applicable Law, all orders and awards binding on Customer or its property, Customer's internal documents and policies (including organizational documents), and all material contracts (including all Contracts) or other instruments binding on or affecting Customer or any of its property. Customer maintains adequate controls to be reasonably assured of such compliance. No legal or governmental proceedings or investigations are pending or threatened to which Customer or any Related Person is a party or in which any property of Customer or any Related Person is subject;

(J) The organizational identification number of Customer, and the name, jurisdiction of organization, type of organization, place of business (if it has only one place of business) or chief executive office (if it has more than one place of business) of each of (i) Customer, (ii) Customer's general partner(s) or managing member(s) (as applicable), and (iii) Adviser, at the date of this Agreement and for the period of five years immediately preceding the date of this Agreement (or, if a shorter period, the period from its date of organization until the date of this Agreement), are, in each case, as set forth on the signature page hereof. If Customer is a partnership, (i) the partner(s) identified on the signature page of this Agreement is/are Customer's only general partner(s), and (ii) Customer will notify Prime Broker in writing prior to any Change of Partner Event. In addition, Customer shall notify Prime Broker at least 30 days prior to any change in the name, type of organization, jurisdiction of organization, place of business (if it has, or after such change will have, only one place of business) or chief executive office (if it has, or after such change will have, more than one place of business) of Customer, any general partner or managing member of Customer, or any change in Customer's organizational identification number;

(K) To the best of Customer's knowledge after conducting reasonable due diligence, all of the sources of Customer's funds, including those from its investors, are legitimate, and Customer will maintain records of such due diligence and make such records available to Prime Broker upon request;

(L) Neither Customer, any person controlling or controlled by Customer, any person having a beneficial interest in Customer, nor any person for whom Customer acts as agent or nominee in connection herewith is: (i) an individual or entity that is named as a Specially Designated National or Blocked Person by the OFAC, or an individual or entity that resides, is organized or chartered, or has a place of business, in a country or territory subject to OFAC's various sanctions/embargo programs; (ii) a resident in, or organized or chartered under the laws of: (a) a jurisdiction that has been designated by the Secretary of the Treasury under Section 311 of the USA PATRIOT Act as warranting special measures and/or as being of primary money laundering concern, or (b) a jurisdiction that has been designated as non-cooperative with international anti-money laundering principles by a multinational or inter-governmental group such as the Financial Action Task Force on Money Laundering of

-3-

which the United States is a member; (iii) a financial institution that has been designated by the Secretary of the Treasury under Section 311 of the USA PATRIOT Act as warranting special measures and/or as being of primary money laundering concern; (iv) a "senior foreign political figure," or any "immediate family" member or "close associate" of a senior foreign political figure, in each case within the meaning of Section 5318(i) of Title 31 of the United States Code or regulations issued thereunder; or (v) a prohibited "foreign shell bank" as defined in Section 5318(j) of Title 31 of the United States Code or regulations issued thereunder, or a U.S. financial institution that has established, maintains, administers or manages an account in the U.S. for, or on behalf of, a prohibited "foreign shell bank";

(M) Unless Customer otherwise informs Prime Broker in writing 10 Business Days in advance of placing any order for participation in an initial public offering (as contemplated by FINRA Rule 5130), Customer is not subject to any limitation whatsoever with respect to such participation. In connection with any such order, Customer will provide sufficient information to Prime Broker to establish, in Prime Broker's judgment, that Customer may participate in such public offering through the order so placed; and

(N) Customer will not enter into any transaction in any way associated with this Agreement "on the basis of" (as defined in paragraph (b) of Rule 10b5-1 under the Securities Exchange Act of 1934, as amended) any material nonpublic information concerning any investment or issuer (or materially related to an issuer in capacities such as a sponsor) of any investment. Nothing contained in this Section 5(N) shall be deemed to prevent Customer from purchasing or selling securities of an issuer when Customer may do so pursuant to one or more of the affirmative defenses available pursuant to paragraph (c) of SEC Rule 10b5-1.

## Section 6: Custody; Consent to Rehypothecate.

(A) Custody   With respect to corporate events affecting the securities in the Prime Broker Account, Prime Broker (i) may take such nondiscretionary action as is necessary, and (ii) shall deal with discretionary rights (including rights to subscribe for securities and conversion rights), warrants and other similar securities only in accordance with Customer's instructions if and as timely received by Prime Broker. Prime Broker may, but is not required to, sign any certificates of ownership or other certificates relating to the securities as required by any regulatory authority, whether governmental or otherwise. Prime Broker may pool Customer's securities with those of one or more other customers of Prime Broker. Where corporate events affect some but not all of the securities held in a pooled account, Prime Broker shall allocate the securities so affected to particular customers as it considers fair and equitable (including, without limitation, pro rata allocation or an impartial lottery).

(B) Consent to Rehypothecate   Customer grants to the BofAML Entities the right, subject to Applicable Law, without further notice to Customer, to hold, register and re-register any Collateral in the name of any BofAML Entity or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of the Collateral, separately or together with other property, with all attendant rights of ownership, for the sum due to one or more BofAML Entities, or for a greater sum and for a longer time than the Obligations or Contracts with respect to which the Collateral was pledged and without retaining in their possession and/or control a like amount of similar Collateral, and to use or invest cash Collateral at its own risk. For the purposes of returning any Collateral to Customer, the obligations of each BofAML Entity shall be satisfied by delivering securities of the same issuer, class and quantity as the relevant Collateral. Customer acknowledges that, with respect to assets used by the BofAML Entities pursuant to this

Section 6(B), (i) Customer may not be able to exercise voting rights or other attendant rights of ownership, (ii) instead of dividend payments, Customer may receive payment "in lieu" of dividend payments, which will not be eligible for a reduced tax rate that may apply to dividends, and (iii) the BofAML Entity may receive compensation in connection with lending Customer's securities, whether in connection with facilitating short sales, or otherwise.

## Section 7: Events of Default.   It shall be an "Event of Default" by Customer if any of the following events occurs:

(A) Customer breaches, repudiates, fails to perform when due or otherwise defaults (however denominated) on any payment or delivery Obligation or any guarantor, credit support provider or general partner of Customer breaches, repudiates, fails to perform when due or otherwise defaults on (however denominated) any payment or delivery obligation under any agreement with any BofAML Entity or document as to which such guarantor, credit support provider or general partner has any obligations, or any BofAML Entity holds any rights;

(B) (i) Customer breaches, repudiates, fails to perform or otherwise defaults on (however denominated) any Obligation other than a payment or delivery Obligation (which, for purposes of this Section 7(B), shall include any and all covenants and agreements contained in any Contract or any document delivered in connection therewith) or otherwise defaults (however denominated) under or in connection with any Contract other than for failure to perform a payment or delivery Obligation, or (ii) any guarantor, credit support provider or general partner of Customer breaches, repudiates, fails to perform when due or otherwise defaults (however denominated) on any obligation other than a payment or delivery obligation under any agreement with any BofAML Entity or document as to which such guarantor, credit support provider or general partner has any obligations or any BofAML Entity holds any rights, or otherwise defaults (however denominated) under or in connection with any such agreement or document other than for failure to perform a payment or delivery obligation;

(C) Any representation, warranty, or statement by Customer or Adviser in any Contract or in any document delivered under or in relation to any Contract or any Obligation is false or misleading in any respect when made or deemed made;

(D) Prime Broker determines, in its reasonable opinion, that any security interest intended to be created by or pursuant to any Contract is not in full force and effect, does not have the priority stated herein or therein or may not be enforced without delay;

(E) Customer, or any guarantor, credit support provider or general partner of Customer admits in writing its inability, or becomes generally unable, to pay its debts as such debts become due, as determined by any BofAML Entity in its sole and absolute discretion;

(F) Any step is taken or legal proceeding started by any person seeking (i) a levy of attachment against any property or accounts of Customer or any guarantor, credit support provider or general partner of Customer, (ii) a determination of the bankruptcy or insolvency of any of the foregoing persons, (iii) the appointment of a receiver, administrator, trustee or similar person in respect of any of the foregoing persons or of any or all of the revenues and assets of any of the foregoing persons, (iv) the general assignment, arrangement or composition with or for the benefit of the creditors of any of the foregoing persons, (v) the liquidation, winding up, termination, administration, dissolution or reorganization of any of the foregoing persons, or (vi) the merger of any of the foregoing persons with or

-4-

into any other person(s); and, in each case, Prime Broker believes that such step or proceeding has a reasonable basis;

(G) Customer is a partnership and a Change of Partner Event occurs; or

(H) Adviser ceases to act as Customer's advisor and Prime Broker determines in its commercially reasonable discretion that such change is material to the activities of Customer or to Prime Broker's view of the credit risk of the relationship with Customer.

Customer shall notify Prime Broker immediately in writing if any of the above Events of Default occurs (or if any event occurs that with the passage of time or the giving of notice would become an Event of Default).

**Section 8: Default Remedies.** If an Event of Default has occurred, each BofAML Entity may, in whole or in part, without further notice to Customer (i) determine Customer to be in default (however denominated) under any and all Contracts, (ii) terminate, accelerate, liquidate or close out any Contract, or take any action or step that will entitle the BofAML Entities to do any of the foregoing, (iii) net, set off and/or recoup any and all of the obligations of such BofAML Entity to Customer (whether matured or unmatured, fixed or contingent, liquidated or unliquidated) against any and all Obligations of Customer to such BofAML Entity, (iv) foreclose on, liquidate, sell or collect on any Collateral (either individually or jointly with others) and apply the proceeds thereof to satisfy any and all Obligations of Customer to any BofAML Entity, (v) exercise any and all rights available to a secured creditor under the NYUCC and any other right or remedy under any Contract or other agreement or Applicable Law, (vi) cancel any outstanding orders for the purchase or sale or borrowing or lending of any securities or other property; and (vii) buy in any securities, commodities or other property of which Prime Broker Account or Accounts may be short, after which Customer shall remain liable for any remaining deficiency, loss, costs or expenses incurred or sustained by the BofAML Entities in connection with such deficiency, (viii) convert at Customer's expense any Obligation from one currency into another currency at such rates as the BofAML Entities shall determine; and (ix) take any other action permitted under any Contract, by law or in equity to protect, preserve or enforce the BofAML Entities' rights or to reduce any risk to any BofAML Entity of loss or delay, including entering into hedging or offsetting transactions for Prime Broker's own account or for Customer's account and risk.

If an Event of Default has occurred, Customer agrees that any BofAML Entity may sell any Collateral or buy in any property, and that any such sale or purchase may be made at the BofAML Entities' sole and absolute discretion on the exchange or other market where such business is usually transacted, or at public auction or at private sale, without advertising the same, without any notice to Customer or of the time or place of sale except as may be required by law, and without prior tender, demand or call of any kind upon Customer, all of which are expressly waived; *provided that* if a BofAML Entity provides notice of the time and place of such sale or purchase or a prior tender, demand or call of any kind, it shall not be considered a waiver of such BofAML Entity's right to sell or buy any Collateral at any time as provided herein. The parties agree and acknowledge that the Collateral is traded on a recognized market. The BofAML Entities to the extent permitted by Applicable Law may purchase or may appropriate (at a commercially reasonable value) the whole of the Collateral or any part thereof free from any right of redemption, and Customer shall remain liable for any deficiency. If less than all of Customer's securities, property or transactions are to be bought, sold or closed out, Prime Broker may in its sole and absolute discretion select which securities, property or transactions are to be

bought, sold or closed out. Customer shall be liable for interest on any sum not paid when due for the period beginning on its due date and ending on the date of its receipt by Prime Broker, both before and after judgment, if obtained. Such interest shall be calculated from time to time at the rate per annum ordinarily charged to Customer plus 2% per annum. All interest payable under this Section 8, if not paid when due, shall be added to the overdue sum at the close of a Prime Broker charge period, as defined in the Truth-in-Lending disclosure statement (attached to the Application), and shall itself bear interest accordingly. The provisions of this Section 8 are exclusively for the benefit and protection of the BofAML Entities and Customer agrees that the BofAML Entities have no obligation to Customer to take any action permitted by this Section 8. Customer explicitly waives any rights to challenge or dispute any BofAML Entity's rights hereunder.

The power of sale under section 101 of the United Kingdom Law of Property Act 1925 ("LPA") shall apply and have effect (without the restrictions imposed by sections 93 and 103 of such Act) on the basis that (i) this Agreement constitutes a mortgage within the meaning of the LPA and (ii) Prime Broker or any BofAML Entity exercising such power of sale is a mortgagee exercising the power of sale conferred on mortgagees by the LPA with limited title guarantee. The powers conferred by this Agreement on any BofAML Entity, or on any receiver appointed by such entity, shall be in addition to those conferred on mortgagees or receivers under the LPA. If there is any ambiguity or conflict between the powers contained in the LPA and those conferred by this Agreement, the terms of this Agreement shall prevail. No one dealing with any BofAML Entity or any receiver appointed by any BofAML Entity need enquire whether any of the powers, authorities and discretions conferred by this Agreement in relation to such property are or may be exercisable by any BofAML Entity or such receiver or as to the propriety or regularity of acts purporting or intended to be in exercise of any such powers. The protection of purchasers contained in sections 104 and 107 of the LPA shall apply to anyone dealing with such BofAML Entity or such receiver as if the statutory powers of sale and of appointing a receiver had not been varied or extended by this Agreement.

**Section 9: Indemnity.**

Customer agrees to indemnify and hold the Indemnified Parties harmless from any and all losses, Taxes, claims, expenses, damages and liabilities of every description ("Costs"), including, but not limited to, reasonable attorneys' fees and expenses (including the cost of any investigation and preparation), judgments, fines and settlements, when and as incurred by the Indemnified Parties, arising out of or in connection with (i) any of the Indemnified Parties acting in reliance on any instruction given by an Authorized Person including instructions of the nature contemplated by Section 10(D) hereof or any of the Indemnified Parties failing to follow the unlawful or unreasonable instructions of an Authorized Person, (ii) Customer's or its agent's breach of any covenant, representation, warranty or agreement in any Contract, (iii) any investigation, litigation or proceeding involving Customer, the Accounts or any Collateral (including any claim or proceedings between Customer and/or any of its Related Persons on one hand and any BofAML Entity on the other hand), (iv) any activities or services of the Indemnified Parties in connection with any Contract and any transactions under any Contract, or any Account (including without limitation, any technology services, reporting, trading, research or capital introduction services), (v) the enforcement by any BofAML Entity of its rights under any Contract, (vi) the dissemination of information to a third party at Customer's direction, (vii) an Event of Default or any action of the BofAML entities taken in order to place the BofAML Entities in the same economic position as they would have been in had an Event of Default not occurred, or (viii) any

-5-

hedging activities intended to mitigate any loss to which any BofAML Entity believes itself to be exposed as a result of an impending Event of Default or an Event of Default. Notwithstanding the foregoing, Customer shall not indemnify the Indemnified Parties for Costs that are the direct result of the BofAML Entities' gross negligence or willful misconduct.

### Section 10: Limitation of Liability.

(A) General   Customer agrees that the Indemnified Parties shall have no liability with respect to any action taken hereunder that is not the direct result of the fraud or willful misconduct of such Indemnified Parties. In no event shall the Indemnified Parties be liable for indirect, punitive, consequential or similar damages. In no event shall the Indemnified Parties be required to pay damages in connection with this Agreement or any actions taken under any Contract in an amount that is greater than the fees earned by the Indemnified Parties in connection with the services provided hereunder (excluding execution fees and related charges) for the immediately preceding 12 month period.

(B) Third Parties.   No Indemnified Party shall be held liable for any acts or omissions of an Executing Broker or other third party. All transactions effected with an Executing Broker or other third party for Customer shall be for the account of Customer, and no Indemnified Party shall have any responsibility to Customer. As between Prime Broker and Customer, (i) Prime Broker shall have no obligation to act as Customer's guarantor with respect to transactions effected by Customer with an Executing Broker or other third party and (ii) Customer alone shall bear any loss resulting from any action taken or not taken by an Executing Broker or its agent (including, without limitation, the insolvency of any such party or the failure of any such party to fulfill its settlement obligations). Customer agrees that it is responsible and liable to each Indemnified Party for all costs, losses, claims or expenses (including reasonable attorney's fees) arising out of Customer's orders with an Executing Broker or other third party and any act or omission by an Executing Broker or other third party. Customer understands that settlement of transactions in foreign securities may not occur simultaneously and that Customer bears all risk in connection thereto. No Indemnified Party shall be held liable for any loss, liability, claim, damage or expense resulting, either directly or indirectly, from a system which is owned by Customer or leased from a third party with or without the knowledge or assistance of the Indemnified Party.

(C) Agents and Subcustodians.   Prime Broker may execute any of its duties and exercise any of its rights under any Contract by or through agents (including affiliates) or employees, including arrangements pursuant to which certain of Customer's securities may be held by subcustodians, banks, financial institutions, clearing organizations and depositories inside or outside the United States. Prime Broker shall use reasonable care to select and appoint agents and shall not be liable for the acts or omissions of any such agent except the acts and omissions of the BofAML Entities.

(D) Release of Data   From time to time, Customer may instruct or authorize Prime Broker or another BofAML Entity to release information relating to Customer, the Accounts or Customer transactions to third-parties, including, without limitation, Executing Brokers, service bureaus and other service providers. No BofAML Entity shall be held liable for any use or misuse of such information by such third parties or any parties who receive such information, directly or indirectly, from or through such third parties.

(E) Force Majeure.   In no event shall any BofAML Entity be held liable for damages or any loss of any kind caused, directly or indirectly, by government restrictions, exchange or market rulings,

suspension of trading, market movements, bank moratoriums, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other events or conditions beyond such BofAML Entity's control or reasonable anticipation. No BofAML Entity shall be liable to Customer for any loss, liability, claim, damage or expense resulting, either directly or indirectly, from any communications network, data processing system, or computer system which any BofAML Entity uses or which is used by Customer, whether any BofAML Entity owns it or not, being rendered inoperable in whole or in part, or from any error or delay in any such network or system, except to the extent caused by the gross negligence or willful misconduct of the BofAML Entities.

### Section 11: Information and Advice.

(A) Provision of Information.   Customer agrees to provide to Prime Broker (for itself and for distribution to any other BofAML Entity that maintains an Account) complete and accurate information on a timely basis in order for the BofAML Entities to effectively control and monitor credit risk. Without limiting the foregoing, Customer shall furnish to Prime Broker within 120 days after the end of each of its fiscal years its annual audited statements and, within 20 days after the end of each fiscal month, its unaudited financial statements. Customer shall also promptly furnish such other financial and other information as Prime Broker may reasonably request from time to time. Customer authorizes Prime Broker to obtain reports concerning Customer's credit standing and business conduct. Customer agrees to execute and deliver, without unreasonable delay, any instruments reasonably requested by Prime Broker associated with obtaining any such report. Customer may make a written request for a description of the nature and scope of the reports obtained by Prime Broker and the same will be provided to Customer within a reasonable period of time. Customer shall send all performance and financial information required to be furnished to Prime Broker pursuant to this Agreement to the following e-mail address: _de.bfdata@bankofamerica.com_.

(B) Tax Documents.   Customer shall, upon reasonable demand, promptly deliver to Prime Broker (for itself and for distribution to any other BofAML Entity that maintains an Account) any form, document, tax receipt or other documentation or information that the BofAML Entities may reasonably request relating to taxation or revenue collection, including for purposes of reducing or eliminating withholding tax on payments made to Customer under any Contract.

(C) Advice.   Customer acknowledges that, unless a BofAML Entity has expressly agreed otherwise in writing and receives compensation specifically identified as consideration for acting as a fiduciary or adviser, none of the BofAML Entities is acting as a fiduciary or an adviser to Customer in respect of any Contract or any transaction it may undertake and no communication from a BofAML Entity shall be construed as an undertaking to act in such a capacity. If any BofAML Entity provides any advice or opinions from time to time, Customer agrees that it shall not rely on any such advice or opinion in making any investment or other decisions.

(D) Information and Compliance   The BofAML Entities do not guarantee or warrant the accuracy, reliability or timeliness of any information that the BofAML Entities may provide or make available to Customer from time to time (nor are they under any obligation to provide any such information or services). With respect to financial instruments and assets discussed in any such information, the BofAML Entities may, without restriction, take positions for their own account, execute transactions for others, and may provide related investment banking and other services to others. Customer agrees that it is solely responsible for monitoring compliance with its own

-6-

internal restrictions and procedures governing investments, trading limits and manner of authorizing investments, and with Applicable Law affecting its authority and ability to trade and invest and no BofAML Entity shall have any obligation to assess whether a Contract or transaction is appropriate or legal for Customer.

**Section 12: Notices and Statements.** Except as otherwise provided herein, Customer and Prime Broker may from time to time issue notices and other communications, either orally or in writing. Each notice shall be directed, if to Prime Broker, to such of its representative(s) as may be notified by Prime Broker from time to time, and if to Customer, to such of its representative(s) as may be notified to Prime Broker from time to time. While the BofAML Entities are under no obligation to do so, BofAML Entities may, from time to time, use reasonable efforts to provide to Customer notices of various types received from courts, claimants and litigants. Each written communication under this Agreement shall be either mailed, e-mailed, faxed, or delivered to the addresses specified on the signature page hereto or at such other address as the party may provide; *provided that*, Prime Broker may, with Customer's consent, post communications onto the Internet.

All communications sent to Customer, whether through the Internet, or by mail, e-mail, facsimile, messenger or otherwise, are deemed given to Customer personally as of the date sent or posted. Except as otherwise specifically provided herein, if Prime Broker gives Customer notice orally (including by telephone), such notice is effective as of the time it is communicated to Customer, and need not be confirmed in writing. Customer shall review promptly all communications that it receives from Prime Broker and shall promptly advise Prime Broker of any error, omission or inaccuracy in the transactions or positions reported. If Customer does not object in writing to any communication within two Business Days after it was sent or posted, such communication is deemed to be complete and correct.

**Section 13: Termination; Assignment; Amendment.**

(A) Termination. This Agreement may be terminated by Prime Broker immediately by giving notice to Customer or by Customer upon giving at least 30 calendar days' prior written notice to Prime Broker; *provided that* Customer's termination notice will be effective only if it is accompanied by instructions for the transfer of all property held in the Prime Broker Account to one or more alternative custodians or other persons (unless Prime Broker waives the requirement to provide such transfer instructions). After a termination notice is given: (i) all provisions of this Agreement shall remain in full force and effect with respect to any transactions (including unsettled transactions), Contracts or Obligations that remain outstanding (together, the "**Outstanding Liabilities**") until all of Customer's obligations under such Outstanding Liabilities have been satisfied in full, (ii) Customer will not be allowed to enter into any new transactions pursuant to this Agreement, and (iii) Prime Broker may, in its sole and absolute discretion, elect to terminate, accelerate, liquidate or otherwise close out any transactions under this Agreement and any Contract (the "**Terminated Transactions**"). Sections 2, 9, 10, 14(N), 14(O), 15, and 16 shall survive termination of this Agreement. The timing and manner of any action taken under this Section 13 and the amounts payable by either party in respect of the Terminated Transactions shall be determined by Prime Broker acting in its sole and absolute discretion. The provisions of this Section 13 are intended to vary and supplement the provisions of any other Contract to which the Terminated Transactions relate and where there is a conflict or inconsistency between the provisions of such Contract and this Agreement, the provisions of this Agreement shall prevail.

(B) Assignment. Prime Broker may at any time assign or transfer all or part of its rights and/or obligations under this Agreement or any transaction effected under any Contract (i) without Customer's consent to any BofAML Entity that is an SEC-registered broker-dealer, (ii) without Customer's consent as part of a transfer of all or part of its prime brokerage business or, (iii) with Customer's prior written consent to any other person (such consent not to be unreasonably withheld or delayed). Any reference in this Agreement to Prime Broker shall also include its successors, permitted transferees or assigns. Customer may not assign its rights or any interest under any Contract without the prior written consent of Prime Broker. Any attempted assignment by Customer in violation of this Agreement shall be null, void and without effect. Prime Broker may disclose to its affiliates, agents and/or vendors or, subject to prior notice to Customer, any other potential assignee, transferee, or service provider such information about Customer and this Agreement as is reasonably necessary and commercially reasonable.

(C) Amendment. Customer agrees that Prime Broker may modify the terms of this Agreement from time to time upon prior written notice when necessary or appropriate to comply with Applicable Law. In any other circumstance, any amendment shall be by mutual written consent. Customer may not modify this Agreement without Prime Broker's written consent.

**Section 14: Miscellaneous.**

(A) Customer Instructions. Customer authorizes the BofAML Entities to act upon any instructions, notices, demands, or requests (whether oral or written, delivered by mail, electronically or by facsimile) which the relevant BofAML Entities reasonably believe to have been given by an Authorized Person. The BofAML Entities shall not be liable for any action taken or not taken in good faith pursuant to such instructions, notices, demands or requests.

(B) Contingent Obligations. The fulfillment of the obligations of the BofAML Entities to Customer under any Contract is contingent upon there being no breach, repudiation, misrepresentation or default (however characterized) by Customer which has occurred under any Contract.

(C) Automated Systems. Customer consents to the BofAML Entities' use of Automated Systems. Customer understands that the use of Automated Systems entails risks, including, but not limited to, interruption of service, system or communications failure, delays in service, and errors in the design, implementation or functioning of such Automated Systems, that could cause substantial damage, expense or liability to Customer. THE BOFAML ENTITIES MAKE NO REPRESENTATION OR WARRANTY OF ANY KIND WITH RESPECT TO THE SELECTION, DESIGN, FUNCTIONALITY, OPERATION, TITLE OR NONINFRINGEMENT OF ANY AUTOMATED SYSTEM, AND MAKE NO EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE FOREGOING, THE BOFAML ENTITIES EXPRESSLY DISCLAIM ANY REPRESENTATION THAT ANY AUTOMATED SYSTEM WILL OPERATE UNINTERRUPTED OR BE ERROR-FREE.

(D) No Waiver; Cumulative Rights. No waiver of any provision of this Agreement shall be deemed to have occurred by the failure or delay by Prime Broker or any of the BofAML Entities to exercise any right or remedy. The single or partial exercise of any such right or remedy will not preclude any other or further exercise thereof or the exercise of any other right or remedy. The authority to debit and charge and the right of set-off and other rights and remedies provided in this Agreement are separate, independent and cumulative and not

-7-

exclusive of any rights or remedies (including any other security, right of set-off, lien, right to combine or consolidate accounts or similar right) to which Prime Broker or any of the BofAML Entities is at any time entitled anywhere, whether by operation of law or otherwise.

(E) Severability. If any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, the legality, validity or enforceability of the remaining provisions of this Agreement and of such provisions under the law of any other jurisdiction shall not be affected or impaired.

(F) Construction. This Agreement supersedes all prior agreements as to matters within its scope, including matters of confidentiality. Except to the extent provided in any other agreement between Prime Broker and Customer that specifically refers to this Agreement and states that it is intended to supersede this Agreement, the terms of this Agreement shall prevail if there is any conflict or inconsistency between this Agreement and any other Contract. All references to Sections are to Sections in or to this Agreement unless otherwise specified. The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References in this Agreement to any English legal term for any action, remedy, method of judicial proceedings, legal document, legal status, court official or any other legal concept is, in respect of any jurisdiction other than England and Wales, deemed to include the legal concept or term which most nearly approximates in that jurisdiction to the English legal term. All references to time herein are to time in New York City.

(G) Currency Contracts. Customer may, from time to time, enter into spot and/or forward currency Contracts with the BofAML Entities (the BofAML Entity entering into the FX Transaction with Customer, the "FX BofAML Entity") in connection with the settlement of Contracts or otherwise as Customer shall direct. Customer acknowledges that none of the BofAML Entities has an obligation to enter into any currency Contracts with, or on behalf of, Customer, and further agrees to furnish to the FX BofAML Entity such documentation to indicate capacity and authority as the FX BofAML Entity may reasonably request prior to entering into such Contracts. Each currency Contract entered into under this Agreement shall constitute an "FX Transaction", as such term is defined in the 1998 FX and Currency Option Definitions, including Annex A thereto, as published by the International Swaps and Derivatives Association, Inc., The Emerging Markets Trading Association and The Foreign Exchange Committee (as may be amended, the "FX Definitions"), and shall be subject to the terms of this Agreement. Any confirmation, whether created by an exchange of facsimiles, SWIFT messages, electronic messaging, matching system or other messaging systems or correspondence, between the FX BofAML Entity and Customer relating to an FX Transaction, whether or not it is expressed to be a confirmation, and unless such FX BofAML Entity and Customer expressly agree otherwise, will be deemed to incorporate the FX Definitions. Notwithstanding the foregoing, Customer authorizes Prime Broker to enter into currency transactions, convert currencies at rates that Prime Broker determines are commercially reasonable, and effect payments in connection with any transaction or Obligation, in each case on Customer's behalf, and authorizes Prime Broker to debit any amount payable by Customer in respect of a currency conversion to the Prime Broker Account. Prime Broker may act as principal in connection with such currency conversions. In the event of any inconsistency between the provisions of any confirmation relating to an FX Transaction and this Agreement, such confirmation shall prevail for purposes of the relevant FX Transaction. In the event of any inconsistency between this Agreement and the FX Definitions, this Agreement shall prevail.

(H) Recordings. Each party recognizes that both parties are afforded protection by the recording of telephone conversations, and each party is aware that the other may record conversations between the parties, their representatives, and/or Executing Brokers relating to the matters referred to in this Agreement, and each party consents to such recording. Each party recognizes that the other party may record conversations without further notice and without assuming responsibility to make or retain such recordings.

(I) Additional Bankruptcy Matters. The parties acknowledge that each Contract is a "securities contract," "swap agreement," "forward contract," "repurchase agreement," or "commodity contract" within the meaning of Title 11 of the United States Code (the "Bankruptcy Code") and that each delivery, transfer, payment and grant of a security interest made or required to be made by, contemplated by, or contemplated in connection with, any Contract is a "transfer" and a "margin payment" or a "settlement payment" within the meaning of Sections 362(b)(6), (7), (17) and/or (27) and Sections 546(e), (f), (g) and/or (j) of the Bankruptcy Code. The parties further acknowledge that this Agreement is a "master netting agreement" within the meaning of the Bankruptcy Code.

(J) 14b-1. Customer does not wish to have certain information pertaining to its beneficial ownership disclosed to a "registrant" (as such term is defined in Rule 14b-1 under the Exchange Act) pursuant to Rule 14b-1 under the Exchange Act. Customer objects to disclosure for the purposes of Rule 14b-1(b)(1)(ii) under the Exchange Act.

(K) Third Party Beneficiaries. Nothing in this Agreement shall create, or be deemed to create, any third-party beneficiary rights in any person or entity other than the BofAML Entities and Customer.

(L) Hong Kong Trading. Customer represents that either (i) it is not currently placing orders with Prime Broker or any other BofAML Entity for the short sale of securities that are admitted to trading on the Stock Exchange of Hong Kong ("Hong Kong Securities") and agrees that it will provide at least 30 calendar days' prior written notice to Prime Broker and will fulfill any additional requirements of Prime Broker or any other BofAML Entity before placing any such orders; or (ii) it has complied with Prime Broker's procedures and requirements, including but not limited to executing a securities lending agreement or a prime brokerage stock loan supplement together with supporting ancillary documentation required by Prime Broker, prior to placing any such orders with Prime Broker or any other BofAML Entity.

(M) Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which will be an original, but all of which will together constitute one and the same instrument.

(N) Confidentiality. Except as otherwise provided in a separate confidentiality agreement between Customer and a BofAML Entity that states by specific reference to this Agreement that it is intended to supersede this Agreement, information made available by Customer to a BofAML Entity pursuant to this Agreement shall be subject to this Section 14(N). No party shall disclose the terms of this Agreement or any information relating thereto to any third party except as permitted under this Agreement or with the prior written consent of the other, and shall keep the same strictly confidential.

The obligations in Section 14 (N) shall not apply:

    i    to the extent such disclosure is required by Applicable Law or in connection with any judicial, arbitral or administrative proceeding or to the extent such disclosure is required or requested by any

-8-

governmental, regulatory or administrative agency having jurisdiction over any party or its respective activities;

ii.   to disclosures made to employees, agents, contractors or advisers, accountants or auditors of a party who are under an obligation or have undertaken to maintain confidentiality of such terms;

iii.   to the extent such terms or information are (a) already in the public domain, (b) otherwise already known or available to the person receiving such information, other than through a breach hereof or (c) independently developed by the person receiving such information; or

iv.   to disclosures made by Prime Broker (a) to any BofAML Entity in connection with this Agreement and any other Contract or (b) to the extent otherwise necessary or appropriate to permit Prime Broker to perform its responsibilities under this Agreement.

(O) Customer shall not use the name of Prime Broker or any of the other BofAML Entities without Prime Broker's or the relevant BofAML Entity's written consent, including without limitation in any advertisement, publication or offering material. Notwithstanding the foregoing, Prime Broker and the other BofAML Entities consent to Customer stating in its offering documents that Prime Broker is its prime broker, so long as such statement is factually accurate as made and such offering documents make clear that Prime Broker and the other BofAML Entities have no responsibility or liability for the preparation or accuracy of such offering documents.

(P) Master-Sub Accounts.   If at any time Customer trades through any sub-account, Customer represents, warrants and covenants that under no circumstances will assets attributed to the sub-account be for the beneficial ownership or interest of any party other than Customer and that Customer has provided all of the capital traded through the sub-account and is ultimately responsible for all trading losses and margin calls associated with the sub-account.

**Section 15: Governing Law.** THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW) SHALL GOVERN THIS AGREEMENT, ITS ENFORCEMENT, AND EACH TRANSACTION ENTERED INTO UNDER, OR CONTEMPLATED BY, AND ALL MATTERS ARISING IN CONNECTION WITH, THIS AGREEMENT OR ANY CONTRACT (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY THEREIN), AND ANY DISPUTE BETWEEN PRIME BROKER AND CUSTOMER, WHETHER ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY CONTRACT, ANY TRANSACTION, CUSTOMER'S ACCOUNTS OR OTHERWISE (INCLUDING, WITHOUT LIMITATION, THE ESTABLISHMENT AND MAINTENANCE OF THE ACCOUNTS AND ALL INTERESTS, DUTIES AND OBLIGATIONS RELATED THERETO). The parties agree that (i) the securities intermediary's jurisdiction, within the meaning of Section 8 110(e) of the NYUCC, in respect of any Account in which any Collateral is deposited or held and in respect of the Collateral, is the State of New York, (ii) the bank's jurisdiction, within the meaning of Section 9-304(b) of the NYUCC, in respect of any deposit account constituting Collateral, or to which any Collateral is credited or in which any Collateral is held or carried is the State of New York; (iii) the commodity intermediary's jurisdiction, within the meaning of Section 9-305(b) of the NYUCC, in respect of any commodity account constituting Collateral, or to which any Collateral is credited or in

which any Collateral is held or carried and in respect of any Collateral consisting of commodity contracts, is the State of New York, and (iv) none of them has or will enter into any agreement to the contrary.

**Section 16: Litigation in Court; Sovereign Immunity; Service.**

(A) IF THE PARTIES CHOOSE TO PROCEED BY LITIGATION, ANY LITIGATION BETWEEN CUSTOMER AND PRIME BROKER OR INVOLVING THEIR RESPECTIVE PROPERTIES MUST BE INSTITUTED IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR THE SUPREME COURT OF THE STATE OF NEW YORK FOR THE COUNTY OF NEW YORK. EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS. EACH PARTY AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR AS OTHERWISE PROVIDED BY LAW. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, ACTION, PROCEEDING OR COUNTERCLAIM, OR OTHER LEGAL ACTION IS WAIVED BY ALL PARTIES TO THIS AGREEMENT.

(B) EACH PARTY HERETO, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IRREVOCABLY WAIVES WITH RESPECT TO ITSELF AND ITS REVENUES AND ASSETS (IRRESPECTIVE OF THEIR USE OR INTENDED USE) ALL IMMUNITY ON THE GROUNDS OF SOVEREIGNTY OR SIMILAR GROUNDS FROM (I) SUIT, (II) JURISDICTION OF ANY COURT, (III) RELIEF BY WAY OF INJUNCTION, ORDER FOR SPECIFIC PERFORMANCE, OR RECOVERY OF PROPERTY, (IV) ATTACHMENT OF ITS ASSETS (WHETHER BEFORE OR AFTER JUDGMENT), AND (V) EXECUTION OR ENFORCEMENT OF ANY JUDGMENT TO WHICH IT OR ITS REVENUES OR ASSETS MIGHT OTHERWISE BE ENTITLED IN ANY ACTIONS OR PROCEEDINGS IN SUCH COURTS, AND IRREVOCABLY AGREES THAT IT WILL NOT CLAIM SUCH IMMUNITY IN ANY SUCH ACTIONS OR PROCEEDINGS.

(C) CUSTOMER CONSENTS TO PROCESS BEING SERVED BY PRIME BROKER ON CUSTOMER IN ANY SUIT, ACTION OR PROCEEDING OF THE NATURE SPECIFIED IN THIS SECTION 16 ABOVE BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO CUSTOMER AT THE ADDRESS SET FORTH AFTER CUSTOMER'S SIGNATURE BELOW; SUCH SERVICE SHALL BE DEEMED COMPLETED AND EFFECTIVE AS FROM 30 DAYS AFTER SUCH MAILING OR SUCH EARLIER TIME SPECIFIED BY APPLICABLE LAW. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS AS OTHERWISE PERMITTED BY LAW.

(D) IRRESPECTIVE OF WHETHER CUSTOMER CHOOSES TO PROCEED BY ARBITRATION OR LITIGATION, CUSTOMER AGREES TO INDEMNIFY AND FULLY REIMBURSE THE INDEMNIFIED PARTIES FOR ALL REASONABLE ATTORNEY'S FEES AND OTHER COSTS AND EXPENSES RELATING TO ANY SUCH PROCEEDINGS.

**Section 17: Defined Terms.**

-19-

"*Account*" means any securities, commodity, deposit, custodial or other account of any kind or nature whatsoever maintained now or hereafter by a BofAML Entity in the name or for the account of Customer, into which Customer's assets or other property are or may be deposited, in which any such assets or other property are or may be held or to which any such assets or other property are or may be credited.

"*Adviser*" means the investment manager or adviser with authority to manage the Prime Broker Account and the other Accounts for Customer on a discretionary basis (as identified on the signature page hereof).

"*Applicable Law*" means all applicable laws, rules, regulations and customs, including common law, and any amendments and supplements thereto, including, without limitation, those of all U.S. and non-U.S. federal, state and local governmental authorities, self-regulatory organizations, markets, exchanges and clearing facilities, in all cases where applicable.

"*Authorized Person*" means a person authorized by Customer to give instructions to the BofAML Entities, and a person that the BofAML Entities reasonably believe to have been so authorized, including Related Persons, until the BofAML Entities receive and acknowledge written notice from Customer of the unauthorized status of such person.

"*Automated Systems*" means any automated systems, including systems owned or made available by a BofAML Entity' or any third party (including any service bureau) in conjunction with the Accounts, including, but not limited to, systems designed to facilitate automated order entry and execution; recordkeeping, reporting and account reconciliation; and risk management systems.

"*BofAML Entities*" means Prime Broker, Bank of America, N.A. (including any and all branches) and any entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the foregoing entities, either collectively or individually, as the context requires (including any such entities that qualify under this definition after the date hereof).

"*Business Day*" means any day on which the New York Stock Exchange is open and conducting business.

"*Change of Partner Event*" shall be deemed to have occurred if, without Prime Broker's prior written consent, (i) one or more general partners of Customer is no longer a partner at any time or resigns, is replaced, or is removed from its position as general partner, or (ii) a legal or natural person replaces an outgoing partner and becomes a partner of Customer after the date hereof without the assignment and transfer of the rights and obligations under each Contract and each transaction thereunder to, and the corresponding assumption of such rights and obligations by, the incoming partner, as partner.

"*Collateral*" means all of Customer's right, title and interest in, to, or under, (i) any or all of the Accounts, (ii) any cash, securities, commodity contracts, general intangibles, investment property, financial assets, and other property which may from time to time be deposited, credited, held or carried in any such Account, or that is due to Customer, or delivered to or in the possession or control of any BofAML Entity or any of BofAML Entity's agents, and all security entitlements with respect to any of the foregoing, (iii) any Contract, including without limitation all of Customer's right, title or interest in, or to any amounts payable by a BofAML Entity to Customer upon the termination, acceleration, liquidation or close-out of such Contract, but, in each case, after giving effect, to the extent

enforceable, to any netting, offset and recoupment rights (including, without limitation, any such right granted under any Contract), and (iv) all income and profits on any of the foregoing, all dividends, interest and other payments and distributions with respect to any of the foregoing, all other rights and privileges appurtenant to any of the foregoing, including any voting rights and any redemption rights, and any substitutions for any of the foregoing and any proceeds of any of the foregoing, in each case whether now existing or hereafter arising (together with the accounts in which such property and financial assets are held).

"*Contract*" means this Agreement as well as any documents or agreements as to which Customer and any BofAML Entity is a party, has any obligations or holds any rights, and any schedules, annexes, supplements, exhibits or confirmations in relation thereto.

"*Control*" (whether or not capitalized) shall include "control" as defined in the NYUCC.

"*Executing Broker*" is defined in the Prime Brokerage Annex.

"*Indemnified Parties*" means the BofAML Entities, and each of their directors, officers, agents, employees and permitted assigns.

"*NYUCC*" means the Uniform Commercial Code, as in effect in the State of New York. The following terms used in this Agreement shall have herein the same meaning as set forth in the NYUCC: "bank", "control", "commodity account", "commodity contract", "commodity intermediary", "deposit account", "entitlement order", "financial assets", "general intangible", "investment property", "securities account", "securities intermediary", and "security entitlement".

"*Obligations*" means any and all obligations of Customer to any BofAML Entity arising at any time and from time to time, whether matured or unmatured, fixed or contingent, liquidated or unliquidated, related to the purchase, sale or loan of securities or other property, or under or in connection with any or all Contracts, Accounts or other accounts containing Collateral.

"*OFAC*" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"*Related Person*" means any of the principals, officers, directors and senior employees (in such official capacity as principal, officer, director or senior employee, as the case may be) of (i) Customer, (ii) Customer's affiliates, (iii) Adviser or (iv) any person or entity for which Adviser acts as investment manager.

"*Securities Act*" means the Securities Act of 1933.

"*Taxes*" means any and all taxes, levies, imposts, duties, charges, assessments or fees of any nature, including interest, penalties and additions thereto that are imposed by any taxing authority.

"*USA PATRIOT Act*" means Bank Secrecy Act as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

Please sign below to indicate Customer's formal acceptance of this Agreement.

**Merrill Lynch Professional Clearing Corp.,**
for itself and as agent for the BofAML Entities

By: _____
    Print Name:
    Title:
    Date:

**MLAF, LP ("Customer")**

By: _____
    Print Name: Carson Block
    Title: Managing Member of MWCP LLC General Partner of MLAF LP
    Date: 11/4/2015

**Muddy Waters Capital LLC** ("Adviser"), solely to make the representations, warranties, covenants and agreements as set forth in the Adviser Annex and the ERISA Annex to this Agreement.

By: _____
    Print Name: Jamie Brown
    Title: Chief Operating Officer
    Date: 11/4/2015

| Customer jurisdiction of organization |
| --- |
| Delaware |
| Type of organization |
| Limited Partnership |
| Place of business / chief executive office / registered office |
| Suite 2028, 575 Market Street, San Francisco CA 94105 |
| Organizational identification number |
| 5866726 |

| Adviser jurisdiction of organization |
| --- |
| Delaware |
| Type of organization |
| Limited Liability Company |
| Place of business / chief executive office / registered office |
| Suite 2028, 575 Market Street, San Francisco CA 94105 |
| Organizational identification number |
| 5608372 |

| Name of General Partner/Managing Member (if applicable) |
| --- |
| MWCP LLC |
| Jurisdiction of organization |
| Delaware |
| Type of organization |
| Limited Liability Company |
| Place of business / chief executive office / registered office |
| 301 Forest Avenue, Laguna Beach CA 92651 |
| Organizational identification number |
| 5888699 |

**Merrill Lynch Professional Clearing Corp.**
**Bank of America Tower**
**One Bryant Park, 6th Floor**
**New York, NY 10036**
**Attention: Legal Notices**
**Email: DG.Legal_Notices_MLPRO@baml.com**

-11-

Prime Brokerage Annex

This Prime Brokerage Annex ("**Prime Brokerage Annex**") forms part of and supplements the Agreement and sets forth certain additional terms and conditions on which Prime Broker will open and maintain the Prime Broker Account.   In the event of any inconsistency between any term of this Prime Brokerage Annex and the Agreement, this Prime Brokerage Annex shall control.   All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement.   For the avoidance of doubt, "Applicable Law" shall include the SEC Letter (as defined below).

**Section 1:  SEC Letter.**  Customer acknowledges that transactions effected or cleared under this Prime Brokerage Annex and the Agreement are subject to the conditions specified by the Securities and Exchange Commission ("**SEC**") in its No-Action Letter relating to prime brokerage, dated January 25, 1994, as such may be amended or supplemented or from time to time or in any subsequent letter superseding such letter (the "**SEC Letter**"), and that it is familiar with, and agrees to comply with, the terms of the SEC Letter.

**Section 2:  Agreements with Executing Brokers.**  Customer may maintain brokerage accounts with other brokers ("**Executing Brokers**") and, from time to time, place orders with Executing Brokers, while designating Prime Broker as its "prime broker" to clear and settle resulting transactions.   Customer appoints Prime Broker as its prime broker and authorizes Prime Broker to (i) execute an agreement with each Executing Broker with which Customer engages in prime brokerage transactions (each such agreement, a "**SIFMA 150 Agreement**") and/or add Customer's name and other relevant information to existing SIFMA 150 Agreements with each Executing Broker; (ii) provide each Executing Broker with any relevant information relating to Customer to establish an account with such Executing Broker in Prime Broker's name for the benefit of Customer; and (iii) perform any necessary or appropriate act as its prime broker in accordance with the Agreement or Applicable Law. Customer understands that Prime Broker will only accept settlements from Executing Brokers with which Prime Broker has entered into a SIFMA 150 Agreement, and that Executing Brokers will be acting as agents of Customer, and not as agents of Prime Broker.   Customer will use its best efforts to assure that each Executing Broker complies with the SIFMA 150 Agreement to which such Executing Broker is a party.  If Customer has instructed Executing Broker to send trade confirmations to Prime Broker on Customer's behalf, Prime Broker agrees that the confirmations will be available to Customer without charge upon request to Prime Broker.

**Section 3:  Settlement.**  Customer will advise Prime Broker prior to 5:30 p.m. (New York time) on each trade date, or such other time as Prime Broker shall advise, of the details of all transactions ("**Trade Data**") effected for it by an Executing Broker on such date.   Customer authorizes Prime Broker to acknowledge, affirm, settle and clear all such transactions.   Prime Broker is further authorized, but not required, to undertake to resolve any unmatched trade report received by it from an Executing Broker; *provided that* Customer shall remain responsible for the ultimate resolution and that Prime Broker shall have no responsibility with respect to Trade Data not correctly transmitted to it on a timely basis by any person or entity, including the Depository Trust Company.   Prime Broker will not be required to make any investigation into the facts surrounding any transaction to which Customer is a party with or through an Executing Broker.  If Customer has instructed an Executing Broker to send trade confirmations to Customer in care of Prime Broker,

Customer understands that such confirmations are available to Customer without charge upon request.   Prime Broker may provide Executing Brokers with any relevant information necessary in order for the Executing Brokers to settle Customer trades.   Nothing in the Agreement, including this Prime Brokerage Annex, shall restrict the absolute right of Prime Broker to DK or disaffirm any trade.

**Section 4:  Minimum Net Equity.**  Customer must maintain in the Prime Broker Account cash and securities with a ready market in an amount equal to or exceeding the greater of the minimum net equity required by the SEC Letter and the amount required by Prime Broker to clear and settle trades ("**Minimum Net Equity**").  If Customer fails to maintain such account in compliance with the Minimum Net Equity requirement, Customer agrees that Prime Broker may, without notice to Customer, disaffirm, DK or decline to affirm, clear or settle any transaction effected by an Executing Broker on Customer's behalf.   Except as provided in Section 10 of this Prime Brokerage Annex, Customer understands that if Prime Broker takes such action with respect to any of Customer's transactions, Prime Broker shall do so for all of Customer's transactions for that day.   In any such case, Prime Broker shall send a cancellation notification to Customer and Customer must settle outstanding trades directly with the relevant Executing Broker.  Customer authorizes Prime Broker to provide the Executing Broker with any information necessary to settle such trades.  Customer further agrees that Prime Broker will not be bound to make any investigation into the facts surrounding any transaction to which Customer is a party and that, immediately upon notice to Customer and, if required, to the Executing Brokers, Prime Broker may cease acting as prime broker for Customer.   Customer further authorizes Prime Broker to terminate the Agreement and exercise the rights described in Section 8 of the Agreement in the event of Customer's failure to maintain Minimum Net Equity in the Prime Broker Account.

**Section 5   Settlement in Bulk.**  If Customer has an Adviser, Customer authorizes Prime Broker to commingle its prime brokerage transactions with those of other accounts of its Adviser ("sub-accounts") for order placement and clearance in bulk in accordance with the instructions of its Adviser.  Customer understands that no part of any transaction may be allocated to any sub-account where such sub-account's net equity is below the Minimum Net Equity and that should such a net equity deficiency occur in any such sub-account, Prime Broker will disaffirm the entire transaction. Customer agrees that, should such an event occur, Adviser may resubmit the bulk trade to the Executing Broker so as to exclude those securities which were originally allocated to the affected sub-account or, if permissible, reallocate the entire prime brokerage transaction to other sub-accounts.  Customer understands that such reallocation must be communicated to Prime Broker within any required deadlines.

**Section 6   Right to Decline.**  Customer agrees that Prime Broker has no obligation to enter into any Contract with, or to effect or settle any trade or other transaction on behalf of, Customer.   Without limiting the foregoing, Customer acknowledges that (i) Prime Broker has the right to limit the number, type and/or size of open positions which Customer may maintain or acquire through any BofAML Entity at any time, and (ii) Prime Broker reserves the right at any time to advise all Executing Brokers, or any particular Executing Broker, that it has placed a limit on the type or size of trades or

-12-

transactions which are to be settled and cleared for Customer by Prime Broker.

**Section 7: Contractual Settlement.** Where a transaction does not settle on the due date for settlement, Prime Broker may in its sole and absolute discretion provisionally credit and debit Customer's Accounts on such settlement date as if the transaction had in fact settled. Prime Broker may in its sole and absolute discretion reverse this contractual settlement at any time.

**Section 8:   Sales, including Short Sales.**   Customer agrees to comply with Prime Broker's requirements relating to short sales. When placing any sell order, Customer agrees to appropriately designate it as "long" or as "short". Customer will designate a sale as "long" only if the securities being sold are securities then owned by the undersigned and such securities are either in the undersigned's account at Prime Broker or will be delivered to Prime Broker as soon as it is possible to do so, without undue inconvenience or expense to Prime Broker. If Customer has sold securities "short" or otherwise has a delivery obligation with respect to securities that are not available for transfer from the Prime Broker Account, Prime Broker may satisfy Customer's obligation to deliver securities to the purchasers thereof by delivering securities on Customer's behalf, subject always to Prime Broker's right to buy in the relevant securities for the Prime Broker Account. Customer understands that any such short sale may fail on settlement date and Customer may be asked to cover its short sale at anytime; in either case, Customer will be responsible for any Obligations that arise therefrom.

**Section 9:   Buying in.**   If Customer instructs a BofAML Entity to sell any security, commodity or other property and such BofAML Entity is unable to deliver the relevant asset to the purchaser by reason of Customer's failure to supply such BofAML Entity with the relevant asset, then Customer authorizes such BofAML Entity to borrow or purchase any such security, commodity or other property necessary to make delivery thereof.

**Section 10:   Termination.**   Prime Broker may, at any time, terminate this Prime Brokerage Annex by notice to Customer or decline to affirm, clear and settle any transaction effected by an Executing Broker on Customer's behalf. If Prime Broker declines to affirm, clear or settle any such transaction (other than after termination of this Prime Brokerage Annex), Prime Broker will make reasonable efforts to promptly notify Customer, but such notice is not a condition to Prime Broker's right to decline to affirm, clear or settle transactions for Customer, and Prime Broker will incur no liability to Customer or any third party for exercising such right. In any such case, and in the case of the termination of this Prime Brokerage Annex, Customer must settle outstanding trades that have been DK'd or disaffirmed and all future trades directly with the Executing Broker. Customer may terminate this Prime Brokerage Annex on one Business Day's notice, effective upon the settlement of all transactions covered by this Prime Broker Annex.   This Prime Brokerage Annex shall terminate immediately upon the termination of the Agreement.

US PBA July 2015 – ML Pro

Adviser Annex

This Adviser Annex (this "**Adviser Annex**") forms part of and supplements the Agreement by setting forth additional representations, warranties, covenants and agreements of Customer and Adviser in consideration for the services provided by Prime Broker and the BofAML Entities under the Agreement. In the event of any inconsistency between any term of this Adviser Annex and the Agreement, this Adviser Annex shall control. All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement.

**Section 1**: Customer and Adviser, in its capacity as agent for Customer and in its corporate/entity capacity, each represents, warrants, covenants and agrees, as of the date hereof, and on each date on which an Obligation is in existence or a transaction or Contract is effected for any Account, that:

(A) Customer has entered into a written agreement with Adviser (the "**Investment Management Agreement**") that (i) authorizes Adviser to render investment advisory services to Customer and take all action with respect to transactions under the Agreement on behalf of Customer in the same manner and with the same force and effect as Customer (including, without limitation, to open accounts with the BofAML Entities on behalf of Customer and to enter into prime brokerage trades on behalf of Customer), (ii) designates Adviser as agent and attorney-in-fact of Customer to give instructions to the BofAML Entities to take all actions necessary for the execution, clearance and settlement of prime brokerage trades and to receive information on behalf of Customer, and (iii) complies with Applicable Law;

(B) Adviser is entering into each transaction under the Agreement (and taking such other actions as are contemplated by this Agreement) as authorized agent on behalf of Customer; the BofAML Entities may rely on the instructions of Adviser, that the information provided by Adviser about Customer is accurate, and on the representations of Adviser respecting its authority to act on behalf of Customer contained herein until the BofAML Entities have received written notice of a change in, or revocation or rescission of such authority; no change in, revocation or rescission of such authority will affect the rights and indemnities inuring to the BofAML Entities with respect to the Obligations of Customer under the Agreement arising prior to actual receipt by the BofAML Entities of written notice of such change, revocation or rescission;

(C) Neither Adviser nor any of its supervised persons (or, if a bank, none of its insiders, using the definition set forth in 12 CFR 215.2(h)) is a person (i) subject to any "bad actor" disqualifying event set forth in Rule 506(d) of Regulation D under the Securities Act of 1933, as amended; (ii) subject to an SEC order issued under Section 203(f) of the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"); (iii) convicted within the previous 10 years of any felony or misdemeanor involving conduct described in Section 203(e)(2)(A-D) of the Advisers Act; (iv) who has been found by the SEC to have engaged, or has been convicted of engaging, in any of the conduct specified in paragraph 1, 5 or 6 of Section 203(e) of the Advisers Act; or (v) subject to an order, judgment or decree described in Section 203(e)(4) of the Advisers Act; and

(D) Customer and Adviser will immediately advise the BofAML Entities in writing if any of the representations contained in this Adviser Annex should become untrue in whole or in part.

**Section 2**: Adviser, in its capacity as agent for Customer and in its individual corporate capacity, additionally represents, warrants, covenants and agrees, as of the date hereof, and on each date on which an Obligation is in existence or a transaction or Contract is effected for any Account, that:

(A) Adviser is duly formed and validly existing under the laws of its jurisdiction of formation;

(B) Adviser is an investment adviser duly registered with the SEC under the Advisers Act (please check only one box):

☐ Yes ☑ No

If "No":

(i) in each U.S. jurisdiction (including each applicable state) and non-U.S. jurisdiction where Adviser is required to be registered, authorized and/or licensed, if any, Adviser is duly registered, authorized and/or licensed, as applicable, with the appropriate authorities in each such jurisdiction;

(ii) if registered as an adviser with a state and/or if relying on an exemption under Section 203(m) or Section 203(b)(3) of the Advisers Act, indicate the Adviser's current aggregate assets under management; and 100mm Commitment

(iii) Adviser is (please check only one box):

☐ an investment adviser not required to be registered with the SEC pursuant to (a) the "private fund adviser" exemption under Section 203(m) of the Advisers Act and Rule 203(m)-1 thereunder; (b) the "venture capital fund adviser" exemption under Section 203(1) of the Advisers Act; (c) the "family office" exclusion under Rule 202(a)(11)(G)-1 under the Advisers Act; (d) the "foreign private adviser" exemption under Section 203(b)(3) of the Advisers Act; or (e) an exemption under Section 203(b) of the Advisers Act other than Section 203(b)(3);

☐ an investment adviser which is not eligible under Section 203A of the Advisers Act to register with the SEC;

☑ an investment adviser not required to be registered pursuant to an exemption under Section 203(b) of the Advisers Act;

☐ a bank as defined under the Advisers Act which is not required to be registered pursuant to the exclusion under Section 202(a)(11) of the Advisers Act; or

☐ an investment adviser or bank not subject to the laws of the United States governing such entities;

(C) Adviser will comply with Applicable Law;

(D) Adviser is satisfied, after sufficient inquiry, that the person (or persons) who executed the Investment Management Agreement for Customer was properly authorized by Customer;

-14-

(E) Adviser has reviewed the investment objectives of Customer and obtained information necessary to satisfy itself of the appropriateness of transactions under the Agreement to be entered into on behalf of Customer. Adviser shall be responsible for determining that the Agreement, the Contracts and the transactions contemplated are fit, proper and suitable for Customer and consistent with the Investment Management Agreement and comply with the terms of this Agreement;

(F) Adviser will not willfully cause Customer to act in violation of the Agreement;

(G) Adviser will enter into a transaction only when the assets in the accounts of Customer under its control are sufficient to meet the obligations resulting from such transaction;

(H) Adviser has collected all of the information requested on the relevant options and forwards disclosure and customer forms (which information Adviser represents to be complete and correct) and will provide the BofAML Entities and Customer with such information upon request;

(I) Adviser will provide, whenever possible, such information regarding Customer and Adviser as may be requested of the BofAML Entities in order to comply with Applicable Law or pursuant to a request by any governmental body or regulator;

(J) Adviser agrees to indemnify the BofAML Entities, to the fullest extent permitted by law, from and against any loss, liability, cost, claim, action, demand or expense (including, without limitation, reasonable costs, expenses and disbursements of legal counsel and investigation), whether direct, indirect, incidental or consequential, resulting from, arising out of or relating to (i) any BofAML Entity acting in accordance with the instructions of Adviser, (ii) any claim by Customer that any transaction entered into by Adviser on Customer's behalf was not suitable, (iii) any claim by Customer that any transaction entered into by Adviser on Customer's behalf was without authority, and (iv) any breach by Adviser of any representation, warranty, covenant or agreement contained herein;

(K) Adviser will not enter into any transaction in any way associated with the Agreement "on the basis of" (as defined in paragraph (b) of Rule 10b5-1 under the Securities Exchange Act of 1934, as amended) any material nonpublic information concerning any investment or issuer (or materially related to an issuer in capacities such as a sponsor) of any investment. Nothing contained in this paragraph (K) shall be deemed to prevent Adviser from purchasing or selling securities of an issuer when Adviser may do so pursuant to one or more of the affirmative defenses available pursuant to paragraph (c) of SEC Rule 10b5-1;

(L) Adviser has completed the large trader questionnaire on Schedule A attached to this Annex.

(M) With respect to risk management tools supplied by RiskMetrics (the "**RiskMetrics Tools**") received from a BofAML Entity:

    1.   if Adviser represents to clients (in Adviser's Form ADV, if applicable, offering documents or otherwise) that it operates in compliance with Section 28(e) of the Exchange Act, then Adviser is using the RiskMetrics Tools solely to lawfully assist it in its investment decision making process; or

    2.   if Adviser is using the RiskMetrics Tools for purposes outside the scope of Section 28(e) of the Exchange Act

(e.g., developing reports for marketing presentations). Adviser does not represent to its clients (in Adviser's Form ADV, if applicable, offering documents or otherwise) that it operates in compliance with Section 28(e) of the Exchange Act.

## Schedule A

### Large Trader Identification:

Is your organization required to be registered with the SEC under Rule 13h-1 as a Large Trader?    ☐ Yes    ☑ No

If so, please state your Large Trader ID, suffix (if any) and the account(s) with which it is associated:

LTID: _____ _____ Account: _____

LTID: _____ _____ Account: _____

LTID: _____ _____ Account: _____

Does any other person or entity possess investment discretion with respect to your account(s)?    ☐ Yes    ☐ No

If so, please identify each such person or entity, its LTID and accounts for which is possesses investment discretion:

Party with Discretion: _____ LTID: _____ Account: _____

Party with Discretion: _____ LTID: _____ Account: _____

Party with Discretion: _____ LTID: _____ Account: _____

(Add supplemental sheets, if necessary.)

US PBA July 2015 – ML Pro

Schedule B

**Large Options Position Reporting (adviser data):**

In an effort to comply with the provisions of CBOE Rule 4.13, Large Option Position Reporting, FINRA Rule 2360(b)(5) and other large option reporting regulatory obligations ("Large Option Position Reporting Rules"), we request your assistance in identifying accounts, that are under the common control of an individual or entity - in other words, accounts that are deemed to be acting in concert. Under the Large Option Position Reporting Rules, each member is required to report aggregated positions for all parties acting in concert. Thus, any customer who, acting alone or in concert with others, maintained aggregate long or short positions on the same side of the market of 200 or more contracts of any single class of option contracts will be reported to CBOE.

To provide more color on when accounts can be considered under common control, CBOE Rule 4.11.03 states that control exists when it is determined that an individual or entity (1) makes investment decisions for an account or accounts, or (2) materially influences directly or indirectly the actions of any person who makes investment decisions for an account or accounts. In addition, control will be presumed where a person or entity has the authority to execute transactions in an account.

This schedule is deemed part of the Adviser Annex to the Prime Brokerage Account Agreement with Prime Broker.

In the event that you manage other accounts carried by Prime Broker we need to collect the information requested in this schedule. *Please note that unless instructed otherwise, these accounts will be deemed to be acting in concert by virtue of assets being commonly managed by you.*

*To facilitate our regulatory reporting please provide a list of all managed accounts carried with Prime Broker and, on an ongoing basis, all accounts deemed to be under common control within the above aforementioned rule. Please attach a separate sheet for each group of accounts deemed to be acting in concert with each other.*

Please complete the below attestation, specifying which accounts are under common control, including Entity Name, Tax ID and the basic circumstances of the common control relationship, and remitting via

* Email:   dg.GMF&S_Documentation_NY@baml.com or
* Fax:     917-267-5032

Thank you in advance for your consideration.

**The undersigned confirms that the listed accounts attached hereto are accounts deemed to be acting in concert with the undersigned Client.**

Name of Adviser: Muddy Waters Capital LLC

Adviser Signature:                                    Date: 11/4/2015

    By:  Carson Block Managing Member

-17-

ERISA Annex

This ERISA Annex (this **"ERISA Annex"**) forms part of and supplements the Agreement.  In the event of any inconsistency between any term of this ERISA Annex and the Agreement, this ERISA Annex shall control.  All capitalized terms used but not defined herein shall have the meaning set forth in the Agreement.

All terms, representations, warranties, provisions and agreements set forth in the checked section below are incorporated herein by reference into the Agreement.  The provisions of this ERISA Annex shall survive termination of the Agreement.

Please check the applicable box below.  If a box has not been checked the representations, warranties, covenants, agreements and acknowledgements in either Section 1 or Section 2, as applicable, of this ERISA Annex will be deemed made by Customer and Adviser at all times during the relevant period under the circumstances applicable to Customer.

**Section 1**                                    : **No Plan Assets.**

(A.) Customer and Adviser, in its capacity as agent for Customer and in its individual corporate capacity, represent and warrant (which representation and warranty will be deemed to be repeated at all times until all Obligations have been satisfied) that Customer is not and is not acting on behalf of (i) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, ("**ERISA**") that is subject to Part 4 of Subtitle B of Title 1 of ERISA, (ii) a "plan" within the meaning of Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "**Code**"), to which Section 4975 of the Code applies, (iii) an entity whose underlying assets include "plan assets" subject to Title 1 of ERISA or Section 4975 of the Code by reason of Section 3(42) of ERISA, U.S. Department of Labor Regulation 29 CFR Section 2510.3-101 or otherwise, or (iv) a "governmental plan" (as defined in ERISA or the Code) or another type of plan (or an entity whose assets are considered to include the assets of any such governmental or other plan) that is subject to any law, rule or restriction that is substantively similar or of similar effect to Section 406 of ERISA or Section 4975 of the Code (**"Similar Law"**).  Customer will provide written notice to the BofAML Entities if it is aware that it is in breach of this representation and warranty or is aware that with the passing of time, giving of notice or expiry of any applicable grace period it will be in breach of this representation and warranty.

(B) Customer agrees to indemnify and hold harmless the Indemnified Parties from and against any cost, damage or loss (including, without limitation, any excise taxes, fines, penalties, interest, profits disgorged, restitution and any related attorneys fees and expenses) incurred by the Indemnified Parties as a result of the representation and warranty in this Section 1 being or becoming untrue or any breach of ERISA, Section 4975 of the Code or Similar Law caused by Customer which exposes the Indemnified Parties to any cost, damage or loss (including, without limitation, any excise taxes, fines, penalties, interest, profits disgorged, restitution and any related attorneys fees and expenses).

Check box if Section 1 applies:          ☑

**Section 2**:  **Plan Assets.**

(A) Customer and Adviser, as agent for Customer and in its individual corporate capacity, each represents and warrants that Customer's assets constitute "plan assets" of any "employee benefit plan" as defined in and subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and/or a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**") for purposes of ERISA and/or Section 4975 of the Code or constitute "plan assets" of an employee benefit plan or arrangement for purposes of another law, rule or restriction substantially similar to Section 406 of ERISA or Section 4975 of the Code ("**Similar Law**").  As such, each of Customer and Adviser represents, warrants, covenants and agrees (which representations, warranties, covenants and agreements shall be deemed to be repeated by Customer and Adviser at all times until all Obligations have been satisfied) that:

1.        Adviser is an "investment manager" (as defined in Section 3(38) of ERISA) with respect to each investor in Customer subject to ERISA and a fiduciary with respect to each investor in Customer subject to Section 406 of ERISA, Section 4975 of the Code and/or any Similar Law and has full power and authority on behalf of Customer to execute and deliver the Agreement and each Contract, to enter into each transaction covered by a Contract and to cause Customer to perform all its obligations under each Contract;

2.        In connection with the negotiation, execution and delivery of the Agreement and each Contract, Adviser is a "qualified professional asset manager" or "QPAM" within the meaning of Part VI of the U.S. Department of Labor Prohibited Transaction Class Exemption 84-14, as amended (the "**QPAM Exemption**") and in such capacity has negotiated and approved each Contract and each transaction covered by a Contract;

3.        The entering into and performance of each Contract and each transaction covered by a Contract, regardless of when entered into, do not and will not constitute a prohibited transaction under Section 406 of ERISA and Section 4975 of the Code due to the application of the QPAM Exemption or another exemption identified and described in Prime Broker by Customer or Adviser before Customer or Adviser relies on such exemption for purposes of this provision;

4.        None of the BofAML Entities is acting as a fiduciary in respect of Customer (including in connection with the exercise of its rights under any Contract) or has any responsibility under the standards governing the conduct of fiduciaries, investment advisers or investment managers, and any information or advice provided by any BofAML Entity under or in connection with any Contract any transaction covered by a Contract does not and will not serve as a primary basis of any investment decision by Customer or Adviser;

5        No Contract or any transaction covered by a Contract will result in a violation of any applicable Similar Law;

6.        As of the date of each transaction that Adviser directs on behalf of Customer, and at all times until the termination of the Agreement and each Contract, Customer and Adviser will be in full compliance with Customer's constituent documents, and the

-18-

transactions that Adviser directs on behalf of Customer are and will be authorized transactions;

7.       Customer and Adviser will not regard any assets pledged as collateral by Customer in connection with any transaction or Contract as constituting "plan assets" within the meaning of Title 1 of ERISA or Section 4975 of the Code;

8.       The BofAML Entities may, among other things, sell, pledge, transfer, rehypothecate, assign, invest, use, commingle or otherwise dispose of or use in its business any Collateral pledged to it by Customer. Adviser specifically represents that it considered and authorized the use by the BofAML Entities of any assets held by or on behalf of the BofAML Entities as Collateral pursuant to a pledge by Customer as part of and in the context of negotiating each Contract and each transaction; and

9.       Adviser has and will have full authority to manage the assets in the Accounts and sufficient assets of Customer are and shall be available to satisfy Customer's obligations under each Contract and in connection with each transaction.

(B) Customer and Adviser, as agent for Customer and in its individual corporate capacity, each represents that Section 404(b) of ERISA shall be satisfied with respect to Customer's assets held with any BofAML entity and Customer and Adviser acknowledge and agree that the BofAML Entities shall have no responsibility for compliance with Section 404(b) of ERISA.

(C) Customer and Adviser acknowledge and agree that if Adviser directs the BofAML Entities to sell securities that are not in the Prime Broker Account, the BofAML Entities are directed to lend securities to the Prime Broker Account. If Adviser buys securities in the Prime Broker Account, the BofAML Entities are directed to exhaust the then-available free funds of the relevant currency held in the Prime Broker Account to purchase the securities, and lend the Prime Broker Account the difference.

(D) Customer and Adviser acknowledge that the BofAML Entities' disclosure pursuant to U.S. Department of Labor regulations under ERISA section 408(b)(2) with respect to the Agreement is available at http://baml.com/LRISA408r2 and will be updated periodically as required.

(E) Customer and Adviser acknowledge that the BofAML Entities are entering into each Contract and each transaction based on the representations, warranties, covenants and agreements in this ERISA Annex.

(F) Neither Customer nor Adviser will take any action during the term of any Contract that would render any of the representations, warranties, covenants or agreements in this ERISA Annex untrue, incorrect or incomplete, and each of Customer and Adviser will immediately give written notice to the BofAML Entities if either Adviser or Customer is in breach of or that, with the passing of time, giving of notice or expiry of any applicable grace period, either Adviser or Customer will be in breach of, any aspect of any of such representations, warranties, covenants or agreements or that any of such representations, warranties, covenants or agreements are or will be untrue.

(G) Customer and Adviser jointly and severally agree to indemnify and hold harmless the Indemnified Parties from and against any cost, damage or loss (including without limitation any excise taxes, fines, penalties, interest, profits disgorged, restitution, and any related attorneys fees and expenses) incurred by the Indemnified Parties as a result of any of the representations, warranties, covenants or agreements in this ERISA Annex being or becoming untrue or any breach of ERISA, Section 4975 of the Code or Similar Law caused by Adviser or Customer which exposes the Indemnified Parties to any cost, damage or loss (including without limitation any excise taxes, fines, penalties, interest, profits disgorged, restitution, and any related attorneys fees and expenses).

Check box if Section Z applies:      ☐

# **Attachment 2**

# Global Prime Brokerage

**Bank of America Merrill Lynch**

## MTD POSTED CASH ACTIVITY
Beneficial Owner: MLAF LP

Period: 01-Dec-2015 to 31-Dec-2015

### MLAF LP (10827515 - D)
### EUR (EUR/USD = 1.086550)
### ACTIVITY

| INVESTMENT DESCRIPTION / IDENTIFIER | TRADE DATE / POSTING DATE | SETTLE DATE | TRANS ID / TRANS TYPE | QUANTITY | TRADE PRICE | NET AMOUNT | RUNNING BALANCE SETTLE CCY | REPORTING CCY (USD) |
|---|---|---|---|---|---|---|---|---|
| EURO | 14-Dec-2015 / 14-Dec-2015 | 14-Dec-2015 | 591943179 / Deposit / Withdrawal | 0 | 0 | (2,187,369.00) | 2,573,295.58 | 2,796,014.31 |
| EUR | 14-Dec-2015 / 14-Dec-2015 | 16-Dec-2015 | 1513295667 / FX Leg - Spot | 0 | 1.10182 | 2,187,369.00 | 4,760,664.58 | 5,172,700.10 |
| Buy EUR 2187369; Sell USD 2410086.91 @ 1.101820 | | | | | | | | |
| CASINO GUICHARD PERRACHO 07FEB25 2.33PCT BTC2K87 | 15-Dec-2015 / 16-Dec-2015 | 17-Dec-2015 | Y17626773782 / Sell Short | (4,000,000) | 89.7981 | 3,591,922.19 | 8,352,586.77 | 9,075,503.15 |
| CASINO GUICHARD PERRACHO 07FEB25 2.33PCT BTC2K87 | 15-Dec-2015 / 17-Dec-2015 | 17-Dec-2015 | 121009007 / Sell Short | (4,000,000) | 87.8 | 3,591,922.19 | 11,944,508.96 | 12,978,306.21 |
| CASINO GUICHARD PERRACHO 07FEB25 2.33PCT BTC2K87 | 17-Dec-2015 / 17-Dec-2015 | 17-Dec-2015 | CXL Y17626773782 / Sell Short | 4,000,000 | 89.7981 | (3,591,922.19) | 8,352,586.77 | 9,075,503.15 |
| CASINO GUICHARD PERRACHO 07MAR24 3.248PCT BKKNHX0 | 16-Dec-2015 / 16-Dec-2015 | 17-Dec-2015 | Y17273505491816 / Sell Short | (5,000,000) | 99.2792 | 4,963,959.02 | 13,316,545.79 | 14,469,092.83 |
| CASINO GUICHARD PERRACHO 07MAR24 3.248PCT BKKNHX0 | 16-Dec-2015 / 16-Dec-2015 | 17-Dec-2015 | Y179832272560 / Sell Short | (3,000,000) | 99.2792 | 2,978,375.41 | 16,294,921.20 | 17,705,246.63 |
| CASINO GUICHARD PERRACHO 07MAR24 3.248PCT BKKNHX0 | 16-Dec-2015 / 16-Dec-2015 | 17-Dec-2015 | Y177275067703196 / Sell Short | (5,000,000) | 99.2792 | 4,963,959.02 | 21,258,880.22 | 23,098,836.30 |
| CASINO GUICHARD PERRACHO 07MAR24 3.248PCT BKKNHX0 | 17-Dec-2015 / 17-Dec-2015 | 17-Dec-2015 | CXL Y17273505491846 / Sell Short | 5,000,000 | 99.2792 | (4,963,959.02) | 16,294,921.20 | 17,705,246.63 |
| CASINO GUICHARD PERRACHO 07MAR24 3.248PCT BKKNHX0 | 15-Dec-2015 / 17-Dec-2015 | 17-Dec-2015 | 121009005 / Sell Short | (5,000,000) | 96.75 | 4,963,959.02 | 21,258,880.22 | 23,098,836.30 |
| CASINO GUICHARD PERRACHO 07MAR24 3.248PCT BKKNHX0 | 15-Dec-2015 / 17-Dec-2015 | 17-Dec-2015 | 121009004 / Sell Short | (3,000,000) | 96.75 | 2,978,375.41 | 24,237,255.63 | 26,334,990.10 |
| CASINO GUICHARD PERRACHO 07MAR24 3.248PCT BKKNHX0 | 15-Dec-2015 / 17-Dec-2015 | 17-Dec-2015 | 121009006 / Sell Short | (5,000,000) | 96.75 | 4,963,959.02 | 29,201,214.65 | 31,728,579.78 |

See disclaimer on the last page of the report for important legal information regarding the reliability of this data.

Processed: 14-Jan-2016 07:40 PM EST
Page 3 of 10

# Global Prime Brokerage



**Bank of America Merrill Lynch**

# MTD POSTED CASH ACTIVITY

**Beneficial Owner: MLAF LP**

Period: 01-Dec-2015 to 31-Dec-2015

## DISCLAIMER:

This is intended solely for the use of the intended recipient(s) and may contain information that is privileged, confidential or proprietary. If you are not an intended recipient, please notify the sender, and then please delete and destroy all copies and attachments, and be advised that any review or dissemination of, or the taking of any action in reliance on, the information contained in or attached to this message is prohibited.

The attached link shows additional disclaimer information

**Report Description -** This report details the daily posting date activity, grouped by currency, which impacts cash balances. The unadjusted opening, adjusted opening, closing and running balances are provided. The report is based on original posting date. Trades that were posted for trade dates in the reporting period are grouped under "New Activity". Trades posted for trade dates prior to the reporting date are included in the "As of Activity" section.

**Below are the parameter values that affect the content and presentation for this report**

| Parameter Name | Parameter Value |
| --- | --- |
| Consolidation Level: | ACCOUNT |
| Report Level: | MLAF LP (212738407) |
| Preferred Product ID: | US GLOBAL |
| Period Range: | 01-Dec-2015 to 31-Dec-2015 |
| Knowledge Date: | 14-Jan-2016 07:40 PM EST |
| Cash Convention: | US |
| Date Basis: | TRADE DATE |
| Reporting Currency: | USD |
| Suppress Cancel Flag: | SAME DAY CANCELS |

## Accounts Within Group

| | | | |
| --- | --- | --- | --- |
| 10827515 | MLAF LP | 10827515 | MLAF LP-US TRADING |
| MLAF_BANA | MUDDY WATERS CAPITAL LLC O/B/O MLAF LP A/C BANA SWAP | 10829802 | MLAF LP-BANA SWAP COLLATERAL DERIV |
| MLAFSWAP | MLAF LP_MLI SWAP | 10829515 | MLAF LP_BANA SWAP |
| MLAF_MLI | MUDDY WATERS CAPITAL LLC O/B/O MLAF LP A/C MLI SWAP | 10829315 | MLAF LP-BANA SWAP US TRADING |